294 So.2d 448

**John Rayford GRAY, Jr.**

v.

**STATE.**

**8 Div. 378.**

Court of Criminal Appeals of Alabama.

April 9, 1974.

Clement J. Cartron, Huntsville, for appellant.

**482**

William J. Baxley, Atty. Gen., Montgomery, and Samuel L. Adams, Sp. Asst. Atty. Gen., Dothan, for the State.

TYSON, Judge.

The Grand Jury of Madison County, Alabama, charged the appellant with the robbery of Joseph Ikard, a cab driver for Drake Cab Company, Inc. The Jury found the appellant guilty and fixed his punishment at ten years imprisonment. The trial court then entered its judgment, setting sentence in accordance with this verdict.

Mrs. Angie Burchfield testified that, on the night of August 25, 1972, she was manager of the American Legion Club, located on Triana Boulevard in the City of Huntsville, Alabama. She stated that about 11:00 in the evening the door bell to the club rang; that she opend the door, and as she did so, she looked out and saw a man, whom she recognized as the appellant, fire several shots at a cab driver seated in a cab. She stated that she identified the ap-pellant at Police Headquarters later that evening.

Mr. Earl Wayne Jackson testified that he had been a passenger in a cab driven by one Joe Ikard on the night of August 25, 1972; that Mr. Ikard took him to the American Legion Club at about 11:00 that evening; that he paid his fare, went to the door of the club, rang the bell, and as the door was being opened, he heard at least three shots fired by a man at the cab driver who had brought him to the club, and that he was unable to identify the man he saw running away. On cross-examination, he stated that he was positive that the man he saw was not one Jimmy Knighten.

Mr. Joseph Ikard testified that he was a cab driver for Drake Cab Company in the City of Huntsville on August 25, 1972. He stated that about 11:00 that evening, he took a party to the American Legion Club, located on Triana Boulevard near Bob Wallace Drive. He stated that, after letting his fare out, he waited a few moments, that a man approached him with a pistol and said, "I had just as soon kill you as look at you." Mr. Ikard positively identified this man as the appellant, John Gray. He stated that the party first shot him in the hand, then fired again and struck him in the hip, that he reached to get his bill-fold, and that he shot him in the hand a second time. He stated that at this point he heard the gun snap and that the appellant took the money and ran. He stated that people in the American Legion Club came out and carried him inside the club, that the police were notified.

On cross-examination, Mr. Ikard admitted that when he was in the hospital for treatment, he had been unable to identify the appellant, and that later he selected the photograph of one Jimmy Knighten. He stated that he had been incorrect in his earlier selection of Jimmy Knighten, and that he was positive that the assailant was the appellant, John Gray.

Mr. Steven R. Robinson testified that he was a police officer for the Huntsville Po-

lice Department on August 25, 1972. He stated that he was on routine patrol shortly after 11:00 that evening when he received a radio bulletin to proceed to the vicinity of the American Legion Club, that a description of the suspect was broadcast on the police radio. He then proceeded to drive out Bob Wallace Drive toward Triana Boulevard. From the record:

"Q What if anything did you see while you were on Bob Wallace?

"A I saw a subject walking west on Bob Wallace, he was at that time about forty to fifty yards from me. He answered the description that I had received on the radio. I called back on the radio and said that I spotted the possible offender in front of Cinema One on Bob Wallace.

"Q After completing your radio message, what did you do at that point?

"A I observed that the subject had a gun sticking out of his belt; it was in his mid section. He had on no shirt, so the gun was obvious to see. I proceeded on, getting closer. And when I got about, I would say, 30 or 40 yards from the subject, he reached in his belt and got a hold of the gun and came out of his belt with the gun. And I put on the brakes of the patrol car and ducked. The patrol car slid around sideways. I came up out of the seat with my shotgun. Before that I had heard a shot; when I ducked, there was a shot.

"Q You didn't see a shot but you heard a shot?

"A Yes, sir.

"Q What you took to be a gunshot?

"A Yes, sir.

"Q You ducked, then what happened?

"A I grabbed my shotgun and came up out of the seat with my shotgun and put it on the subject that had the gun.

"Q And who was that, sir? Is he here in the Courtroom?

"A Yes, sir, he is.

"Q Would you point him out to the Jury, please?

"A John Gray."

Police Detective A. C. Edger of the Huntsville Police Department testified that he participated in the investigation of the robbery complaint of the cab driver near the American Legion Club on the night of August 25, 1972. He stated that he interviewed the appellant that evening at Police Headquarters and administered a "Miranda warning," that after advising the appellant of his rights, the following statement was given to him:

"A 'Jimmy Knighten came by my house about 5:30 P.M. the 25th of August. We took his daddy home and then we went to the State Store and got some wine. Then we went to Brahm Spring Park to drink the wine. Later we went up town to the AAA Bonding Company. Jimmy paid some on his bond. We went back to the State Store and got some more wine. Then we went to West Huntsville. Jimmy said let's rob somebody. He got a cab at the American Legion Hut. He pulled the gun and told him, the cab driver, to give him his money. He wouldn't give it up at first. Then Jimmy shot him. The cab driver saw Jimmy was serious then and gave him some money. Then Jimmy shot him again. He started to run and handed me the gun and told me to hide it. Then the police car came by and I was arrested. Jimmy ran down the side street by the railroad track. Jimmy shot the cab driver.'"

Mr. Edgar Greene, an Assistant District Attorney with the District Attorney's Office of Madison County, Alabama, testified that, approximately a week prior to September 14, 1972, he received the following note:

"Ed Greene—D. A. Will you come up to the Jail. I want to talk to you about

the charge against me and Jimmy Knighten. He didn't know anything about the robbery. I will sign a statement saying he didn't. John Gray."

Mr. Greene testified that he did not talk with the appellant until the morning of the preliminary hearing, which was September 14, 1972, and that the appellant gave him the following statement:

". . . I then asked him to tell me what had happened, and Gray then stated that he had done the robbery. I asked him what did he do, he said he and Knighten had gotten together and were drinking wine. They went to a store and bought the wine, went down to Braham Springs Park and were drinking it. Knighten had come over to his house to get him to sell him a pistol. While they were there, they went and bought the wine and went out to drink it. While they were in Braham Springs Park, Gray had told Knighten that he would go get the money for the pistol up at his house. Knighten told him to take the pistol and go get the money. Gray said he went up, found a cab driver and took the gun, told the cab driver to give him his money, and then he shot the cab driver one time, the cab driver fell, and he shot him a couple more times. He couldn't remember whether he got any money from him or not. He stated that Knighten wasn't with him and he didn't know anything about it, he did it all himself. He figured the reason he did this was that he was messed up on wine. Then there was some conversation with Knighten. Gray then also stated in response to my question that he was picked up by the police with the gun in his hand walking down the street. Then I talked with Gray, asked him if this was the truth, he said that it was. I then asked him if he understood that such a crime could get him a considerable amount of time in the penitentiary for shooting a cab driver, and he said, 'Yes, he knew that.' I think that was all."

The appellant's motion to exclude the State's evidence was overruled.

At trial the appellant testified that it was only because of threats by Jimmy Knighten to his wife and child, that he had given the statement to District Attorney Greene. Appellant's version of what occurred on the evening of August 25, 1972, indicated that Jimmy Knighten sold him a pistol that evening; that they had been together drinking beer and wine for several hours in the late afternoon and the early evening; that they drove out Triana Boulevard, that Jimmy Knighten got out of the car, and that he remained in it. From the record:

"Q  What was the next thing that happened?

"A  Well, he was gone about three or four minutes, and he should have done been back. And I got out looking for him.

"Q  Please speak up.

"A  He was gone about three or four minutes, and I got out looking for him. I figured he passed out somewhere.

"Q  Where did you go?

"A  I went toward Triana Blvd. and I heard some shots, and I seen him. And I went over there where he was at, and he run up to me and handed me the gun and said, 'Hide it,' and run.

"Q  What did you do?

"A  I stuck it in my belt and run.

"Q.  Stuck it in your belt and ran?

"A  Yes, sir."

The State presented Jimmy Knighten in rebuttal, and he admitted that he had sold the appellant a pistol on the evening of August 25, 1972, and that he had been with him earlier during the evening drinking beer and wine. He stated that they drove toward Dean's Trailer Court, which is

about one-half block from the American Legion Club. From the record:

"Q How far is Dean's Trailer Court from the American Legion Hut?

"A About half a block.

"Q This defendant told you he was going to go home and get the money to pay you for the pistol?

"A Yes, sir.

"Q So you all had a car there?

"A Yes, sir.

"Q You did not drive over there?

"A No, sir, we lost the keys out there in the field where we was drinking.

"Q Have you gotten the car back yet?

"A No, sir.

"Q Do you know where the car is?

"A It's in the wrecker place where they impounded it.

"Q Now, after this defendant left you there at Dean's Trailer Court, would you tell this jury what happened next?

"A Yes, he left, stayed gone about ten or fifteen minutes, supposed to have been going to get the money. He come back about ten or fifteen minutes later, he was running, and I heard some shooting. He run back up to me and said he shot the cab driver. When he did, he took off through Dean's Trailer Court and down toward Bob Wallace.

"Q Where did you go?

"A I went home.

"Q You left the car there?

"A Yes, sir, I didn't have no keys.

"Q You talked to Detective Edger some days later. Do you know how many days later?

"A I think about three.

"Q How did you get to Detective Edger?

"A I came up there and gave myself up."

I

The appellant excepted to the trial court's oral charge in which the court read the provisions of Title 14, Section 14, Code of Alabama 1940, to the Jury on the grounds "that there was insufficient evidence to bear out the proof that there was any concert of action to commit a crime by two or more people."

Title 14, Section 14, Code of Alabama 1940, reads as follows:

*"Accessories before the fact; principals in first and second degrees; distinction abolished.*—The distinction between an accessory before the fact and a principal, between principals in the first and second degree, in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of misdemeanors."

This Court, through Harwood, J., in Parsons v. State, 33 Ala.App. 309, 33 So.2d 164, in construing this section, stated:

"The participation in a crime and the community of purpose of the perpetrators need not be proved by direct or positive testimony, but may be inferred from circumstantial evidence. West v. State, 25 Ala.App. 492, 149 So. 354; Kelly v. State, 31 Ala.App. 194, 13 So.2d 691; Williams v. State, 31 Ala.App. 48, 11 So.2d 870, and where several persons participated in a robbery it is immaterial which one takes the property. Hood v. State, 18 Ala.App. 287, 92 So. 30. All persons participating in a crime are guilty as principals. Title 14, Section 14, Code of Alabama 1940."

We cannot accord merit to the appellant's exception to this aspect of the trial

court's oral charge. We will not undertake to set out all of the oral charge relative to aiding and abetting, or to the conspiracy, but suffice it to say that the thrust of this charge and its legal effect was to enlighten the jury on the provisions of Title 14, Section 14, Code of Alabama 1940.

In dealing with this aspect of the evidence and the same contention, this Court very recently in Lee v. State, 51 Ala.App. 332, 285 So.2d 495, cert. denied, 291 Ala. 787, 285 So.2d 500, stated:

"Title 14, Section 99, Recompiled Code, 1958, reads as follows:

" '§ 99, * * * Any two or more persons conspiring together to commit an assault on another with intent to murder, maim, rob, ravish, or to commit the crime against nature, or who attempt to poison any human being, or to commit murder by any means not amounting to an assault, shall each themselves be guilty of a felony, and shall, on conviction, be imprisoned in the penitentiary of the state of Alabama for not less than one year, and not more than ten years.'

"Otherwise, conspiracy to commit a felony is a misdemeanor. Title 14, Section 100, Recompiled Code, 1958.

"In Jones v. State, 174 Ala. 53, 57 So. 31, our Supreme Court quoted with approval a pronouncement in Morris v. State, 146 Ala. 66, 41 So. 274, 280, as follows:

" 'When by prearrangement, or on the spur of the moment, "two or more persons enter upon a common enterprise or adventure, and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist, the active perpetrator in the commission of the offense, is a guilty participant, and, in the eye of the law, is equally guilty with the one who does the act. Such community of purpose, or conspiracy, need not be proved by positive testimony. It rarely is so proved. The jury are to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case." '

"The Supreme Court in the *Jones* case, supra, further observed:

" 'Aid and abet "comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary. No particular acts are necessary. If encouragement be given to commit the felony, or if, giving due weight to all the testimony, the jury are convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, then that ingredient of the offense is made out." [Raiford v. State] Raiford's Case, 59 Ala. 106; [State ex rel. Attorney General v. Talley] Tally's Case, 102 Ala. 25, et seq., 15 So. 722.' "

■ The appellant contends here that, if an offense was committed, under the evidence there was only one perpetrator; hence, the charge on conspiracy, and on aiding and abetting, was improper.

Our Supreme Court in Stokley v. State, 254 Ala. 534, 49 So.2d 284, spoke directly to this contention, as follows:

"However, if an offense is committed by one or more of them, from causes having no connection with the common object, the responsibility for such offense attaches exclusively to its actual perpetrator. Frank v. State, 27 Ala. 37; Jordan v. State, 79 Ala. 9, 13; Williams v. State, 81 Ala. 1, 5, 1 So. 179. In such cases it is a question for the jury whether the act done was in prosecution of the purpose for which the party had assembled or confederated, or was independ-

ent, of it, and without any previous concert. Frank v. State, supra."

It is clear under the evidence that the trial court properly charged the Jury in the case at bar, as above indicated.

■ Moreover, had the appellant wished to call some particular legal principle to the attention of the Jury, he should have tendered specific written charges covering the alleged omitted principle. Stokley v. State, supra; Patton v. State, 39 Ala.App. 308, 98 So.2d 621.

■ Counsel must submit written instructions covering the alleged omitted or erroneous legal principle in order to properly preserve the alleged error for appellate review. Davis v. State, 246 Ala. 101, 19 So.2d 358; Waller v. State, 35 Ala.App. 511, 49 So.2d 232, and authorities therein cited.

We have carefully examined this entire record, as required by Title 15, Section 389, Code of Alabama 1940, and find same to be free from error. The judgment of the trial court is due to be and the same is hereby

Affirmed.

All the Judges concur.