325 So.2d 520

**Danny Ray COLSTON**

v.

**STATE.**

**6 Div. 890.**

Court of Criminal Appeals of Alabama.

Nov. 4, 1975.

Rehearing Denied Dec. 9, 1975.

J. Wm. Thomason, Bessemer, for appellant.

**6**

William J. Baxley, Atty. Gen., Montgomery, and David L. Weathers, Asst. Atty. Gen., Birmingham, for appellee.

BOOKOUT, Judge.

Robbery; Sentence: 50 years imprisonment.

The state's first witness, Joe Corsentino, testified that on April 9, 1974, he was operating a store in the city of Bessemer, Alabama. On that day, around 1:20 p. m., he was on the way from the rear of the store to the front when his single employee, Mrs. Latino, informed him that there were some customers in the rear of the store. He saw two men standing before the meat counter. One of the men said, "We want seventy-five cents worth of bologna," and one of them then said, "Zeigler's bologna." He took the bologna out to slice it and one of the two men said, "I'm sorry, this is a stick-up, we won't need this bologna." They then searched him and took him by the hand and said, "Let's go to the front."

Mr. Corsentino stated that he saw Mrs. Latino, his employee, kneeling in a corner at the check-out counter. One of the two men said, "Open the cash register," but when he started to open it, they said, "No, let her open it." Mrs. Latino opened both registers and also gave them money from a money box. The currency taken included two rolls of quarters. Mr. Corsentino stated that the appellant then walked over to the register and got some Kool cigarettes, started around the counter, and shot Mrs. Latino and then shot him. Mr. Corsentino fell to the floor and saw the appellant shoot Mrs. Latino again.

Mr. Corsentino testified that one hundred sixty-four dollars ($164.00) in the cash register and an unknown amount of money in the currency box was taken. He also identified State's Exhibits 1 and 2 as the coat and sweater that the appellant was wearing at the time of the robbery.

On cross-examination Mr. Corsentino was questioned concerning his identification of the appellant and one Johnny Lee White as the robbers. He admitted that he was not able to identify the appellant previously from a lineup in which the appellant was present.

However, he made a positive in-court identification of Colston and testified that his recognition came, "[b]ecause in—during the questioning of him at the inquest that there was certain expressions that he put on his face that I'll never forget whenever he shot that lady." Defense counsel then commented:

"Okay. You are telling this jury that you're identifying this man based on an expression on his face?"

Mr. Corsentino replied:

"That's right, the look on his face when he came around the counter there with that gun."

There was also some question as to statements the witness made at preliminary hearing as to whether he was so nervous at the time of the robbery that he could not identify either robber. However, the witness denied that he had become nervous and gone to pieces during the robbery, and his in-court identification was definite.

The next witness called by the state was James A. Boohaker. He testified that he was self-employed and sold groceries, candy, dry goods, and cigarettes to stores on a wholesale basis. He had served Mr. Corsentino's store for over twenty years and he always went there on Mondays, and did so on April 8, 1974, at which time he left two rolls of quarters. Mr. Boohaker testified that he had obtained the rolls of coins from customers and had taped each one with masking tape and that he had been doing this as a practice for twenty years. He then identified State's Exhibit 3 as one of the coin wrappers. He also identified his tape machine and tape.

Joanne Latino testified that she lived with her grandparents, but that before her mother's death on April 9, 1974, she had lived with her. The main thrust of her testimony was that she identified her mother's purse as State's Exhibit 5 and also stated that inside her mother's purse was a small gold coin purse, which was shown later to be in the possession of the appellant.

Loy Ray Simmons testified as to his residence and that he knew the appellant and had known him for some time. He testified that the appellant came to his house on April 9, 1974, to pick up a jacket and some pants that Simmons had been making for him. Simmons testified that the appellant showed him a small gold coin purse and asked him to burn it, but that he told

Colston to take it away. On cross-examination he was not certain of the date he was shown the purse. Simmons admitted to being a homosexual, but said he had not had homosexual relations with his roommate, Willie Williams, or with Johnny Lee White. He also denied having made any sexual advances to the appellant and denied testifying against the appellant because Colston would not have sexual relations with him.

Willie Richard Williams testified that he lived with Loy Ray Simmons and that he had known the appellant a good while. He recalled Colston and White coming to his house, although he could not recall the specific date. Williams identified State's Exhibits 1 and 2 as the clothes worn by the appellant. He also testified that he went into a room with the appellant and White and observed a sack containing Kool cigarettes, a pocketful of change, and some one, five, and ten dollar bills, a twenty-two caliber pistol, a radio, and a movie camera.

Williams stated that he no longer lived with Simmons, and he also admitted to being a homosexual. However, he stated that he had not had sexual relations with Simmons or Johnny Lee White. Williams also denied having made any homosexual advances toward the appellant. He stated that it was not a fact that his testimony was based on a desire to see Colston convicted because Colston refused to have homosexual relations with him.

Willie Williams, correcting prior contradictory testimony, testified further that he heard Colston tell White that White did not have to shoot the lady. On redirect examination, Williams said that this occurred the last time that Colston and White were at his house together.

Joe Padalino testified that he operated a grocery store in Bessemer each day from 6:00 a. m. until around 3:00 p. m. He testified that the appellant came into his store about ten minutes before 3:00 p. m. on April 9, 1974. Appellant asked if he could

get ten dollars in exchange for a roll of quarters. The appellant handed a roll of quarters to Mrs. Padalino and she handed them to Mr. Padalino. Appellant then asked if there was anything wrong and Mr. Padalino replied that there was not; that he would count the quarters later since it was almost time to close the store. Mr. Padalino stated that the roll of quarters was distinctively marked and that masking tape was over both ends. He identified State's Exhibit 3 as the same wrapper he had given to the police on April 9, 1974.

Lieutenant J. R. Pace testified that he was Chief of Detectives for the Bessemer Police Department and that he had participated in the investigation of the robbery. Lieutenant Pace, pursuant to an investigation, went to 500 Dunbar Court in Bessemer and recovered two items of clothing identified as State's Exhibits 1 and 2. He also identified a quarter wrapper he received from a police sergeant which he had turned over to the State Toxicologist's Office in Birmingham for testing. Lieutenant Pace also stated that the appellant had been in numerous lineups but had never been positively identified. He stated that both the appellant and Johnny Lee White were known by him and that the appellant is the darker of the two black males.

Craig Bailey testified for the state that he was a criminologist employed by the State Department of Toxicology and Criminal Investigation, located in Birmingham. He had examined a quarter wrapper and he identified it as State's Exhibit 3. He also had examined a tape dispenser which was identified as State's Exhibit 4. The witness then explained that he had made a gross examination and a microscopic examination of the width of the teeth marks made by the tape dispenser and had compared those to the tape on the rolls and found them to be of the same consistency. He stated that he had examined them as to color, texture, and aging, and found them to be similar. State's Ex-

hibits 1, 2, 3, 4, and 6 were then received into evidence without objection.

The defense called as its first witness, Carl Sims, who stated that he had been in Mr. Corsentino's store prior to its being robbed and that he saw two black males there. He stated that he could not identify whether Johnny Lee White was one of them or not. He was also asked whether he had a judgment as to whether the appellant was in the store at the time. This was objected to and sustained. The witness then testified that he observed the two black males in the street and that they were about the same height and that one appeared a little darker than the other. He stated that one of them told him they were about to rob the store and to get what he wanted and leave. Sims then left, and seeing Mrs. Corsentino down the street, stopped her and informed her that there might be trouble at the store.

Appellant, Danny Ray Colston, testified that the first time he saw Johnny Lee White on April 9, 1974, was early in the day when he and Willie King and Myron Williams were riding around together and picked up White. The appellant stated that White was talking about robbing something that day and appellant told him that he (White) had just gotten out of jail and should not do anything like that. The appellant said that he and White got out of the car. He refused to go with White and instead went to look at a car at a car lot. It was some time later that he was walking to Simmons' house to get the suit, that White pulled up and told him to get in the car. He stated that another person was driving the car and that the other person told White that he did not have to shoot the woman, to which White responded that he had to and that he hated white people anyway. Colston said White then gave him a roll of quarters and said not to say anything to anybody about the incident.

The appellant testified that they went into Simmons' house where the appellant put

the suit coat on and that the conversation was that White should not have committed the robbery since he had just gotten out of jail. Colston said White again told him, "not a word to anybody."

The appellant stated that he did not participate in any way in the robbery and that both Simmons and Willie Williams had made sexual advances to him, which he had refused. The appellant stated that both Williams and Simmons said they would get him some day, but he had thought it to be a joke at the time.

On rebuttal the state called Myron Williams who stated that White and Colston were riding around with him on the morning of the robbery and that both got out of the car together around 11:00 a. m. He said that he had occasion to see the appellant at a local club called the Casino, on the night of April 9. The appellant told him that he and Pink Panther (nickname for Johnny Lee White) had gone to Southside and hit a store, and that he thought Pink Panther had shot at the floor four times.

The state rested at this point and defense counsel asked that the state be required to produce a statement of Mr. Corsentino taken by police officers and a statement taken of Myron Williams. That motion was overruled. The state then requested and was allowed to reopen its case, over objection. The state recalled the appellant, Colston, for recross examination. Colston testified that he had been convicted in 1971 of buying, receiving or concealing stolen property.

On redirect examination, Colston testified that he did go to the Casino and saw Myron Williams there that night, but that he did not tell Williams that he and White had hit a store, or that White had fired four times into the floor. He further testified that he had pled guilty to the charge of buying, receiving or concealing stolen property.

## I

Appellant contends that it was error for the trial court to allow the prosecutor to make numerous remarks concerning murder in closing argument.

The recent case of *Edson v. State,* 53 Ala.App. 460, 301 So.2d 226 (1974) held:

"There is no legal standard by which the prejudicial qualities of improper remarks of a district attorney in the trial of a case can be gauged. Each case must be determined on its own merits. *Smith v. State,* 282 Ala. 268, 210 So.2d 826.

Counsel are allowed considerable latitude in drawing their deductions from the evidence in argument to the jury. *Bryson v. State,* 264 Ala. 111, 84 So.2o (sic) 785; *Garrett v. State,* 268 Ala. 299, 105 So.2d 541; *Espey v. State,* 270 Ala. 669, 120 So.2d 904."

In the instant case, it is the appellant's contention that there were numerous remarks injected by the prosecutor into the trial which were highly prejudicial to the outcome of the case. Those remarks concerned the shooting of Mrs. Latino. However, evidence was presented by Mr. Corsentino that Mrs. Latino was shot during the course of the robbery. This was clearly part of the res gestae, *Dillard v. State,* 27 Ala.App. 50, 165 So. 783. Thus, it was a proper subject of comment.

In *Jackson v. State,* 229 Ala. 48, 155 So. 581 (1934) the Supreme Court stated:

". . . Everything constituting the one continuous transaction is admissible as of the res gestae. No matter how many distinct crimes may be involved, all the details of the one continuous criminal occurrence or adventure may be considered by the jury in passing upon the culpability, the wickedness, and depravity of the crime for which the party is being tried. In cases of robbery the jury is given a wide range of discretion in fixing the punishment. They may look to all the circumstances constituting part of

the res gestae in meting out punishment within the limits prescribed by law. It follows all these circumstances are the subject of legitimate argument on the part of the solicitor. *Ingram v. State* (39 Ala. 247), supra; *Kennedy v. State,* 182 Ala. 10, 62 So. 49; *Smith v. State,* 88 Ala. 73, 7 So. 52; 16 C.J. § 1115."

Appellant's counsel made repeated objections and motions for mistrial during the prosecutor's closing argument, which were overruled. The following appeared in the record:

"MR. REYNOLDS: You say, well, Myron Williams told us that Danny Colston told Johnny White, 'You didn't have to shoot the lady,' and Myron Williams up here said it, he said Johnny Lee White committed the offence (sic) by shooting the lady. First of all, he's charged with robbery, not murder. Second of all, he's guilty of both, if you want to know the truth about the facts of the matter, because—

"MR. THOMASON: May it please the Court—

"THE COURT:—Sustained.

"MR. THOMASON: We move for a mistrial.

"THE COURT: Overruled.

"MR. THOMASON: That's entirely prejudicial.

"MR. REYNOLDS: I'm arguing the res gestae in the case.

"THE COURT: Overruled.

"MR. THOMASON: Move for a mistrial.

"THE COURT: I thought I overruled.

"MR. THOMASON: Maybe you did, Your Honor.

"THE COURT: Overruled."

Before counsel could finish his objection, the trial court sustained it, but there was no request made to exclude this from the jury. A similar situation arose in *Hipp v. State,* 47 Ala.App. 580, 258 So.2d 920 (1972) wherein this Court said:

"We shall now consider whether or not there was reversible error connected with the argument of the district attorney by the ruling of the court thereon. Objections to the remarks were sustained. There were no requests that they be excluded from the jury. We do not consider the statements of such prejudicial nature as that their possible unfavorable influence could not have been eliminated by proper instruction from the trial judge if corrective action had been requested. *Woodward v. State,* 34 Ala.App. 391, 40 So.2d 737, certiorari denied, 252 Ala. 326, 40 So.2d 741."

In *Scott v. State,* 47 Ala.App. 509, 257 So.2d 369 (1972) this Court stated:

"Ordinarily there are three situations in which improper argument may be the basis for reversal. The first of which is an argument which is so grossly improper and highly prejudicial as to be ineradicable by proper ruling of the judge. *Anderson v. State,* 209 Ala. 36, 95 So. 171. Second, is argument which in its cumulative effect creates an atmosphere of bias and prejudice which no remarks by the trial court could eradicate. *Blue v. State,* 246 Ala. 73, 19 So.2d 11. It differs from the first type of improper argument in that no single remark would be sufficient justification for reversal. Instead, the cumulative nature of the remarks creates an atmosphere of prejudice which requires reversal. Finally and obviously, is prejudicial argument which the judge fails to rule on properly."

The argument of the prosecuting attorney does not fall sufficiently within any of the three categories quoted above, so as to warrant reversal of this case. The evidence presented at trial established that Mrs. Latino was shot during the robbery and died as a result. Therefore, the clos-

ing argument of the prosecuting attorney was in fact based upon the evidence. The trial judge promptly sustained objection to the prosecutor's remarks, quoted hereinabove, before counsel could finish his objection. Looking at the argument, and realizing that we have only before us that portion of the argument to which objections were made, it is the opinion of this Court that such argument was not so grossly improper and prejudicial as to deny the appellant his right to a fair and impartial trial.

## II

■ Appellant contends that a case may not be reopened after both sides have rested and a witness called for further evidence unless there be a showing why such evidence was not elicited previously and why it was not offered before both sides rested. As authority, appellant cites *Brooks v. Cox*, 285 Ala. 267, 231 So.2d 302 (1970). In *Brooks,* the trial judge denied the plaintiff's motion to reopen the case which was not an abuse of discretion. However, the reopening of the state's case, after it has rested, is a matter which can be denied or allowed within the discretion of the trial judge. *Savage v. State,* 8 Ala. App. 334, 62 So. 999 (1913); *Boice v. State,* 10 Ala.App. 100, 65 So. 83 (1914); *Miller v. State,* 39 Ala.App. 584, 105 So.2d 711 (1958).

In *Breedlove v. State,* 44 Ala.App. 191, 204 So.2d 836, (1967) this Court stated:

"The courts of this State have further held that the court may, in its discretion, allow a case to be reopened by the State after defendant had rested. *Williams v. State,* 26 Ala.App. 531, 163 So. 663, cert. den. 231 Ala. 127, 163 So. 667; *Nicholson v. State,* 149 Ala. 61, 42 So. 1015; *Payne v. State,* 261 Ala. 397, 74 So.2d 630."

■ In the instant case both sides had rested. However, no arguments had begun when the trial judge allowed the state to reopen their case. In *Hill v. State,* 48 Ala.App. 240, 263 So.2d 696 (1972) Judge Tyson, speaking for this Court, stated:

"The Court allowed the State to reopen its case, over objection, for the purpose of proving the value of the car. The reception of additional evidence after the State has closed, but before final argument, to supply an omission, is within the discretion of the trial judge."

It follows from the authorities cited herein that the trial judge has the discretionary power to allow or disallow the reopening of the case after either or both sides have rested but before final arguments to the jury have commenced. It is therefore the opinion of this Court that there was no error below in allowing the state to reopen its case.

## III

■ Appellant contends that it was error for the trial court to comment on the evidence by giving a charge on the law concerning accomplices. Appellant argues that there was no evidence in this case which would have authorized the giving of the accomplice charge. However, we find that there was evidence introduced at trial which would justify the giving of such charge. There was testimony that the appellant was with White before and after the robbery and that he received a roll of quarters from White. Mr. Corsentino testified that there were two men who committed the robbery at his grocery store and that appellant was one of them.

The charge given by the trial judge was taken from Title 14, Section 14, Code of Alabama 1940 which reads as follows:

"Accessories before the fact; principals in first and second degrees; distinction abolished.—The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abolished; and all persons concerned in

the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of misdemeanors."

In *Parsons v. State,* 33 Ala.App. 309, 33 So.2d 164 (1947) Judge Harwood, in construing this section, stated:

"The participation in a crime and the community of purpose of the perpetrators need not be proved by direct or positive testimony, but may be inferred from circumstantial evidence. *West v. State,* 25 Ala.App. 492, 149 So. 354; *Kelly v. State,* 31 Ala.App. 194, 13 So.2d 691; *Williams v. State,* 31 Ala.App. 48, 11 So.2d 870, and where several persons participated in a robbery it is immaterial which one takes the property. *Hood v. State,* 18 Ala.App. 287, 92 So. 30. All persons participating in a crime are guilty as principals. Title 14, Section 14, Code of Alabama 1940."

In *Morris v. State,* 146 Ala. 66, 41 So. 274 (1906), our Supreme Court said:

"When by prearrangement, or on the spur of the moment, 'two or more persons enter upon a common enterprise or adventure, and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist, the active perpetrator in the commission of the offense, is a guilty participant, and, in the eye of the law, is equally guilty with the one who does the act. Such community of purpose, or conspiracy, need not be proved by positive testimony. It rarely is so proved. The jury are to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case.' "

Likewise, in *Jones v. State,* 174 Ala. 53, 57 So. 31 (1911), the Court stated:

"Aid and abet 'comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary. No particular acts are necessary. If encouragement be given to commit the felony, or if, giving due weight to all the testimony, the jury are convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, then that ingredient of the offense is made out.' [*Raiford v. State*] *Raiford's Case,* 59 Ala. 106; [*State ex rel. Attorney General v. Tally*] *Tally's Case,* 102 Ala. 25, et seq., 15 So. 722."

See also, *Gray v. State,* 52 Ala.App. 481, 294 So.2d 448 (1974).

It is the opinion of this Court, that under the evidence presented, the trial judge in the instant case properly charged the jury.

### IV

Appellant contends that any system of jury selection or jury striking which is not uniform statewide violates the Alabama and U. S. Constitutions. Article VI, § 139, Constitution of Alabama; Fourteenth Amendment, United States Constitution.

The present law in question, Section 714, Vol. 14, Appendix, Code of Alabama 1940, Recompiled 1958, applies to counties attaining a population of 400,000 or more. Appellant argues that *Dixon v. State,* 27 Ala. App. 64, 167 So. 340, cert. den. 232 Ala. 150, 167 So. 349 (1936), which holds the aforementioned law constitutional, is no longer controlling. However, this Court has very recently reviewed *Dixon,* and found that it is still controlling. *Mallory v. State,* 55 Ala.App. 82, 313 So.2d 203 (1975). See also *Junior v. State,* 47 Ala. App. 518, 257 So.2d 844, cert. den. 288 Ala. 744, 257 So.2d 852 (1972).

We do not construe Article VI, Section 139, Constitution of Alabama, as affecting the selection of juries in Jefferson County. The phrase, in Section 139, ". . . the judicial power of the state shall be vested in a unified judicial system . . .," has reference only to the establishment of a system of appellate, circuit, district, probate, and municipal courts. It has no application as suggested by appellant.

## V

Appellant contends that the venire from which he had to strike a jury was not drawn in conformity with the statute. He contends that he was not allowed to strike a jury from a venire selected by a random drawing of available jurors.

J. B. Vines, the Circuit Clerk for the Bessemer Division, testified as to the method of selection of jurors in that Division. He explained that after the venire had been sworn, the cards of all available jurors were shuffled and then put in groups of twelve. At the time thirty-six veniremen were presented in the instant case, from which the defendant and the state were to strike, a jury was deliberating in another court. The thirty-six had been drawn from all the remaining jurors available at that time, excluding those then serving on the other jury.

After cards of all available jurors had been shuffled and segregated into groups of twelve, the first thirty-six then available, in numerical order, were presented for striking. Some seven cards were left after the thirty-six were drawn.

Appellant moved that he be, "allowed to strike from the entire venire." The Court overruled. The next day, the appellant asked the Court to take judicial knowledge that the other jury had ended deliberations and was available for service. He moved the Court to reorganize the venire and include that jury. The Court also overruled that motion. The motion, as presented, and evidence thereon were limited to the method of selecting the list of thirty-six jurors from which both sides would strike.

Code Section 715 of Vol. 14, Appendix, sets forth the proper method:

"§ 715. Manner of obtaining names for jurors in attendance; selection in absence of demand for struck jury.—The twenty-four, or thirty-six, jurors shall be obtained from all of the jurors then in attendance upon the court and who at the time are readily and presently available for the trial of the case in such manner but without selection of names *as the judge of such courts may prescribe by rule of court, or if no such rule is provided, then in such manner, but without selection of names, as ordered by the judge presiding on the trial of the case.* In the event neither the prosecution nor any defendant demands a struck jury, the court shall obtain without selection of names, twelve competent jurors from the jurors then in attendance upon the court, and readily available for the trial, which said twelve jurors shall try the case. (1955, 2nd Ex.Sess., p. 166, appvd. Apr. 8, 1955; 1955 Cum.Supp., 62 § 227(1).)" (Emphasis supplied).

In reviewing the testimony of the Circuit Clerk, we find no evidence that the thirty-six were selected improperly. The above emphasized portions of Sec. 715 leave the manner of selection to the discretion of the trial court, with the limitation that it must be accomplished, "without the selection of names." There is no evidence that the names of the jurors were the basis of their selection. In fact, of all those appearing and sworn, the jury panels were drawn from the shuffled cards, and listed numerically in the sequence in which they were drawn. Excluding the first jury then deliberating, appellant was given a list of thirty-six from which to strike of those remaining and then available.

Section 715, supra, does not require that the lists be made in the order that

**14**

they are drawn from a hat or a box. That section gives the trial court discretion to draw from a hat or a box, or to select some other method, "but without selection of names."

■ We see no material or prejudicial difference between (a) shuffling a group of cards and then compiling a list as they appear numerically in the stack, as opposed to (b) putting the cards in a box and numerically listing them as each is drawn therefrom. In either instance the selection is without regard to whose name appears on the card.

■ We likewise find no merit in appellant's argument that the trial court should have reorganized the venire the next day when the other jury finished its deliberations and was available. The list of thirty-six jurors was selected from all jurors available at the time it was presented to the appellant. That is all the law required.

It would be an unreasonable burden to require a court to reorganize a venire list already provided in a particular case each time a jury in another court had been dismissed and became available. In circuits such as Jefferson County this is especially so where many trials are continually in progress.

VI

■ Appellant states a correct proposition of law, that he has the right of wide-ranging cross-examination. Title 7, § 443, Code of Alabama, 1940. However, we disagree that he was prejudicially limited in the scope of his cross-examination in the instances complained of.

■ Appellant's contention is that he was unable to explore the possibility that Johnny Lee White was a procurer of males for Loy Ray Simmons and Willie Williams. Johnny Lee White was not a part to the instant case nor was he a witness.

Whatever probative value such would have is uncertain. Counsel for appellant stated to the trial court, in the presence of the jury,

". . . We hereby offer to show that the reputation of this witness is a male and that this witness's sexual practice is to have sex relationship with males and that this witness has made sexual advances to the defendant and those sexual advances have been declined by the defendant, the defendant has refused to have sexual relations with this witness. . . ."

The defense was allowed: (1) to ask Simmons if he was a homosexual, which he admitted; (2) to ask if Simmons had had sexual relations with Williams, which he denied; (3) to ask twice if Simmons had made sexual advances toward the appellant, which he twice denied; (4) to ask Simmons if Williams was his "husband," which he denied; (5) to ask Simmons what his sleeping arrangements were with Williams; (6) to ask Simmons if he said his name was Laura; (7) to refer to Simmons as "her" in a verbal motion to exclude Simmons' testimony; (8) to ask Simmons if he had sexual relations with Johnny Lee White, which he denied; and (9) to ask Simmons twice if his testimony concerning appellant's possession of the gold coin purse was as a vendetta against appellant for having refused Simmons' sexual advances. Simmons denied this.

The defense was then allowed: (1) to ask Willie Williams if he had sexual relations with Simmons, which he denied; (2) to ask Williams if he had sexual relations with Johnny Lee White, which he denied; (3) to ask Williams if he knew whether White was a homosexual, which he did not know; (4) to ask three times if Williams had made homosexual advances toward appellant, which he denied three times; and (5) to ask Williams if his testimony was not based upon a desire to convict appellant because appellant had refused to have

a homosexual relationship with him. Williams denied this.

We are unable to find that the trial court's refusal to allow appellant to continue such repetitious and futile lines of questioning amounted to a prejudicial limitation on the right of cross-examination. *Wright v. State,* 49 Ala.App. 539, 274 So.2d 95 (1973); *Browder v. State,* 54 Ala.App. 369, 308 So.2d 729, cert. den. 293 Ala. 746, 308 So.2d 735. (1974).

## VII

In testing the sufficiency of the evidence, we are required to consider the evidence in the most favorable light for the prosecution. *Womack v. State,* 34 Ala.App. 487, 41 So.2d 429 (1949). Conflicting testimony presents a question for the jury, and this includes identification testimony. A verdict of guilty may not be set aside on the ground of insufficiency of the evidence, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. *Bridges v. State,* 284 Ala. 412, 225 So.2d 821 (1969).

Where there is legal evidence from which the jury can, by fair inference, find the defendant guilty, we have no right to disturb such verdict. *Price v. State,* 53 Ala.App. 465, 301 So.2d 230 (1974); *Pugh v. State,* 51 Ala.App. 164, 283 So.2d 616 (1973); *Bass v. State,* 55 Ala.App. 86, 313 So.2d 208 (1975).

We here find that the prosecution presented sufficient evidence to support the jury's verdict of guilty.

Affirmed.

All the Judges concur.