Appellant was convicted of assault with intent to murder and the court sentenced him to fifteen years in the penitentiary. The court further ordered the sentence imposed to run concurrently with a life sentence imposed for murder growing out of the same incident in which the victim's boy friend was shot in the neck by appellant. At arraignment, in the presence of retained counsel, appellant pleaded not guilty. After sentence was imposed appellant gave notice of appeal and filed a motion for a new trial. This motion was subsequently overruled and denied.
The evidence adduced by the state and that presented by appellant was in sharp conflict and only a jury could reconcile this conflicting testimony and arrive at a verdict.
During the late evening of Saturday, August 19, 1978, or the early morning of August 20, 1978, Leslie Hakes and Kathy Robb were hitchhiking from Jacksonville, Alabama to Anniston, Alabama. Appellant, who was driving a pickup truck, stopped to pick them up. Hakes and Robb had spent the previous Friday night, August 18, together in her Army barracks room at Fort McClellan where both were then stationed. Hakes and Robb were unmarried soldiers. While in Jacksonville they went to a lounge and drank six beers each.
Appellant lived in Anniston with his parents and was a licensed gunsmith. On Saturday morning, August 20, 1978, he went target shooting with a friend and they were shooting a .45 caliber pistol. Appellant owned several pistols including a .38 caliber revolver. On Saturday night he went to Jacksonville alone in his pickup truck and had the .45 pistol and also the .38 pistol in his truck. He drank six beers and bought a six pack of beer to carry with him. Also in the truck was some marijuana. While driving toward Anniston he saw Hakes and Robb on the highway "thumbing" a ride and he stopped his truck to give them a ride.
During the trip to Anniston appellant showed his .45 pistol to Robb and she handed it to Hakes. Hakes returned the pistol to Robb who placed it on the floorboard of the truck. None of the trio wanted to drink warm beer and appellant stated he knew a "bootlegger" where they might be able to get some cold beer. He drove to a trailer where the "bootlegger" resided and knocked on the door but got no response. He returned to his truck and asked the couple if they would like to go partying and they agreed. Appellant drove up a bumpy road which opened up into a clearing overlooking Anniston. Appellant asked Hakes if he could roll cigarettes and Hakes said he could. Appellant then got some marijuana out of his truck and Hakes sat on the passenger's side of the truck and started making cigarettes. Appellant and Robb were standing nearby and conversing.
After talking for a few minutes appellant tried to kiss Robb and she refused. Appellant then apologized. A few minutes later *Page 305 
appellant pulled out a pistol and pointed it at Robb and told Hakes to get out of the truck and lie down on the ground in a "spread-eagle" position. Hakes complied with this demand. Appellant then told Robb if she didn't do what he told her that he would shoot Hakes. Appellant was holding Robb and told her to take off her clothes. She refused and appellant pulled on her dress and began striking her on her head with the butt of the gun. Robb managed to break loose and started running toward the woods. While running she heard gunshots and felt a sharp pain in her buttocks. She fell and crawled into the woods and tried to cover herself with leaves.
Robb further testified she heard someone trying to crank the truck but the motor did not start. Shortly thereafter she heard footsteps running in the direction that came to the place where appellant stopped his truck. Thinking, perhaps, that appellant had left, she emerged from the woods looking for Leslie Hakes. She called his name but he did not answer. She started looking around the truck and found him lying on the ground with a big puddle underneath his head. He didn't move, so she didn't touch him. She then crawled down the cliff to another road and lay in the middle of the road waiting for help.
On cross-examination she stated that, when appellant arrived at the clearing, he turned his truck around facing the direction from which it had come. She also stated that she had been dating Hakes for about two months. She admitted that Hakes stayed in her barracks Friday night and they were together all day Saturday. She also admitted that she and Hakes went to a place known as "Poor Richard's" Saturday night and drank about six beers apiece. She further stated that, although she knew Hakes rolled marijuana cigarettes, she could not recall anyone smoking them. She said even though appellant struck her on the head with the butt end of his pistol this did not cause any bleeding or cause lacerations. She said appellant only hit her once with the pistol before she broke away from him and ran into the woods. She further testified that she did not remember touching the truck after returning from the woods and finding Hakes dead. She admitted that her blood type was A.
On redirect examination Robb testified that she was shot three times that night. In addition to being shot in her left buttock she was shot in her left ear and left arm. She did not really know she had been shot in the ear and arm until she was in the hospital.
John M. Case, a criminalist with the Department of Forensic Sciences, testified that the six cartridge casings found around the truck were all fired from appellant's gun. Gunpowder was found at the bottom of the back of Hakes' shirt.
On cross-examination Case testified that, when he test-fired the weapon at a cloth target from a distance of three feet, he found three particles of powder which fell off the cloth with no definite pattern. He said, to find powder burns on the skin, it was his opinion that the shot would have to be fired within a distance of twelve inches.
John Norris, an Evidence Technician with the Anniston Police Department, testified that, on the night of August 20, 1978, he was on Hillyer High Road near the crest of the road on the mountain; that Greenbrier Road was about 400 yards south of him. He was off duty and was there with a friend and his date; that he heard a series of shots. Two shots were in rapid succession, then a pause of several seconds followed by three shots in rapid succession, another pause for about a minute, and then one final shot; that the sound of the shots came from the south in the direction of Greenbrier Road. Upon hearing the series of shots Officer Norris picked up the CB radio and contacted the Anniston Police Department. He remained where he was until a police unit arrived.
On cross-examination Officer Norris stated he heard the shots at about 1:10 a.m. and had arrived in the area approximately five minutes before he heard the gunfire. He said the shots sounded like they were about 300 yards away. *Page 306 
Sergeant Charles Hall of the Anniston Police Department testified that a dispatch came in relating that shots had been fired on Greenbrier Road. He drove to Hillyer High Road and contacted Officer Norris. When he arrived on Greenbrier Road between 2:00 and 3:00 a.m., he found two cars stopped on the road and a woman lying in the roadway. Hall went to the woman and saw that she looked as though she had been beaten and shot. He observed blood coming from the side of her head and she complained of being shot in a section of her back. According to Sergeant Hall the woman kept saying her boyfriend had been shot.
Sergeant Hall left the woman with another police officer and went to search for the man who allegedly had been shot. He proceeded north on Greenbrier Road up to the top of the mountain. Two police officers were in a car behind him. When he went down a deserted road overlooking Greenbrier he saw a green pickup truck which he recognized as belonging to appellant. Hall looked behind the truck and found the body. The body was fifteen or twenty feet beyond the truck with the feet to the rear of the truck with the head pointed south. After securing the scene he searched the wooded area for anyone else who might have been involved, without success. He then called for the detectives and the crime laboratory. He made a diligent effort to find appellant but his efforts proved fruitless.
Sergeant Hall identified State's Exhibits 1, 2, 4, 5, 7, 8, 9, 10, 11, 12 and 13 as truly depicting the scene as he viewed it at the time he saw it. The court sustained appellant's objections to Exhibits 1 and 4 but allowed the other photographs into evidence.
During his investigation Hall saw a .45 automatic cartridge casing on the ground near the wheel of the green pickup truck and others scattered around in the area. He also found a half consumed bottle of beer a good way down the road from the truck. The bottle was cold and he picked it up and took it to the truck. He said he may have placed it on a battery there.
On cross-examination Hall stated the cold bottle of beer was found about fifty yards back up the roadway north of the front of the truck.
Lieutenant Richard Townsley of the Anniston Police Department testified that he went to the small clearing at the end of a jeep trail overlooking Greenbrier Road. After examining State's Exhibit 11, the officer stated there was a cliff just beyond the location of the body shown in the photograph. He also found a fresh-fired .45 caliber cartridge casing on the ground near the truck as well as five other cartridge casings in the same condition in the area. He found a battery on the ground with jumper cables connecting it to the battery under the hood of the truck; an unrolled sleeping bag with appellant's name on it; some partially smoked marijuana cigarettes; a blood stained hand print on the passenger's side of the truck; one lead projectile on the ground under the head of Leslie Hakes, and a set of keys to the truck was given to him by Lieutenant Hale. It was Townsley's opinion that the lead projectile under Hakes' head was fired downward at a 45 degree angle.
On cross-examination Townsley testified that two freshly rolled marijuana cigarettes were in the truck and a spilled plastic bag of marijuana was on the ground on the passenger's side of the truck. Particles of marijuana were found on the hands of Hakes. He also found five unopened cans of warm Pabst beer in the truck and a bottle of Michelob beer on top of the battery. He further stated that the heels of Hakes were approximately six yards from the back of the truck and that Hakes was about six feet tall.
On redirect examination Townsley stated that State's Exhibits 26, 27 and 28, all being photographs of Hakes, accurately depicted the scene as he viewed it that night and were admitted into evidence without objection; that he observed only two holes in Hakes' body, (1) in the right back portion of the neck, and (2) in the left front portion of the upper neck. The lead projectile was *Page 307 
found near the hole on the side of the neck that was facing downward.
Dr. Rembert Reynolds, General Surgeon in the Army and stationed at Fort McClellan, stated that he treated Kathy Robb in the Emergency Room the night she was brought to the hospital. She had been shot in the left earlobe, had abrasions and powder burns about the face and ear. She had wounds in the left upper arm where the bullet had entered and exited, also an entrance wound in the left buttock. X-rays revealed the bullet was lodged near the hip joint, and no attempt was made to remove the bullet.
Dr. William H. Landrum, who was employed by the Department of Forensic Sciences, testified that the blood on the fender of the truck was Group O human blood. Hakes' blood was also Group O. Three stains of blood were found on appellant's overalls or coveralls at the bottom of the left pants leg. Group A human blood was on the shoe strings of appellant's shoe. Group A human blood was the type found on appellant's pants leg. As we have pointed out, Robb's blood type is A.
Dr. Joseph Embry of the Department of Forensic Sciences testified that he performed the autopsy on the body of Leslie Hakes and found no gunpowder residue in or around the wounds. State's Exhibits 33 and 34 showed these wounds. The entrance and exit wounds were on the same level in relation to the top of the head. Hakes also had some blanched or pressure areas on the left cheek and chin.
Appellant testified in his defense. He said he was a licensed gunsmith. He stated he went to a bar in Jacksonville Saturday night and drank about six beers. He was alone. On the way back to Anniston he picked up a couple who were hitchhiking. According to his testimony the man he picked up asked him if he wanted to party and appellant agreed. After failing to get some cold beer at the trailer home of the "bootlegger," appellant asked the man if he smoked and he said yes. Appellant furnished the marijuana and the man started rolling a cigarette, but appellant told him it wasn't good to ride around and smoke. The man asked him if he knew a place where they could stop and appellant replied that he knew a place close by. Appellant then drove to a place on top of the mountain and turned the truck around so that it faced the way he entered. All three got out of the truck.
The couple went into the woods to relieve themselves and appellant took a bedroll out of the truck and sat on it. A few minutes later the couple returned separately. The man sat in the truck and the girl and appellant were standing by the cab. Appellant stated the man rolled some marijuana cigarettes and the trio smoked them. According to appellant he and the girl went and sat on the bedroll and talked for a while. Then they started walking back to the truck. At this point appellant claimed the man was walking toward him and said, "That will cost you, buddy." He also told appellant to move away from the girl. The man appeared to have a gun and appellant became afraid and started to pull his gun from his pocket. At this time appellant claimed the girl grabbed his arm and in the struggle his gun went off and the girl relaxed her hold on his arm and he was able to pull his arm away. Appellant denied he hit the girl on the head with the butt of his pistol. He claimed he pushed the girl in the direction of the approaching man and turned around and started to run away. As appellant ran into the woods he fired a few more shots in the direction of the couple.
Appellant stayed in the woods about ten minutes. He then returned to his truck to get his other pistol which had been in the glove compartment of the truck and which he found within a couple of feet of the body of the man he had killed. He tried to crank the truck but it wouldn't start. Appellant then went back into the woods and stayed until daylight. He then went to the home of a friend and called his father who soon arrived and picked him up. The next day he and his father went to the police station and surrendered both pistols and he turned himself in to the authorities.
Appellant stated his blood type was O. *Page 308 
On cross-examination appellant admitted that, when his pistol went off the first time, no one else had a finger on the trigger. He further admitted that no one shot at him or even threatened to shoot him or do anything else to him. He also admitted that as he was running away he just pointed the gun in the general direction he came from and fired several times. Appellant admitted that he saw Kathy Robb lying in the middle of Greenbrier Road and he did not go to her and offer to assist her in any way.
It can be readily seen from a recitation of the testimonies of Kathy Robb and appellant that they are poles apart as to what occurred on this fatal occasion on this lonely and deserted mountain top in Calhoun County that left a man dead and a bullet in Robb's buttock that she will carry with her to the grave. What is the truth? The jury sided with Kathy Robb and against appellant.
Dr. Wendell Sowell testified as an expert for the defense. He stated that he test-fired the .45 caliber automatic in this case into a bar of Octagon soap which has practically the same consistency as the human neck. When he fired at the distance of three feet there was a lot of gunpowder residue in a definite pattern. In none of the tests Dr. Sowell made did the bullet stay on top of the ground.
According to Dr. Sowell the wound in Leslie Hakes' neck appeared to have been a bullet that had hit something else before striking the deceased. He also said that the blood on appellant's clothing was drops, not splattered, and would have come from someone bleeding close to appellant. As to the hand print on the truck he said it was not appellant's because the hand print was 7 5/8 inches and appellant's hand is only 7 1/4 inches long. It was also Dr. Sowell's opinion that the bullet found under the head of the deceased was on the ground and the deceased fell on top of the bullet.
On cross-examination this witness said that he had not been a full time Forensic man since 1968. He admitted using hollow-point bullets ammunition during the ballistics tests and that he fired straight into the ground. He did not measure the hand print on the truck but a photograph of the hand print.
Appellant contends he was entitled to a mistrial by the actions of the prosecutor during the voir dire qualifications of the jury venire in asking the venire if any of them knew the defendant and in asking the defendant to stand up. Appellant stood up at the request of the prosecutor before an objection was interposed and his counsel moved for a mistrial on the basis the defendant was asked to give testimony against himself. The trial court overruled the motion.
The law is clear that merely requesting a defendant to stand for purposes of identification before the jury venire is not a violation of his constitutional privilege against self-incrimination. Jones v. State, 54 Ala. App. 167,306 So.2d 33; judgment affirmed, 293 Ala. 762, 306 So.2d 45.
Appellant claims the prosecutor committed reversible error during his closing argument when he stated, "We've got the murder weapon," and pointed to the .45 automatic pistol which was introduced into evidence without objection. This same pistol was used by appellant in shooting Kathy Robb three times and in killing Leslie Hakes during the shooting spree arising out of the same incident and was clearly a part of the res gestae and fully supported by the evidence.
All facts admitted into evidence are subject to comment by counsel and counsel are allowed considerable latitude in drawing legal inferences from the evidence in their arguments to the jury. Espey v. State, 270 Ala. 669, 120 So.2d 904;Roberts v. State, Ala.Cr.App., 346 So.2d 473, cert. denied, Ala., 346 So.2d 478; Colston v. State, 57 Ala. App. 4,325 So.2d 520, cert. denied, 295 Ala. 398, 325 So.2d 531; Grissett v.State, 241 Ala. 343, 2 So.2d 399.
The trial court did not err in admitting into evidence photographs of the deceased, Leslie Hakes, as they were clearly a part of the res gestae, and as shedding light *Page 309 
on the acts, motive and intent of appellant. Higginbotham v.State, 262 Ala. 236, 78 So.2d 637; Scott v. State, Ala.Cr.App.,353 So.2d 36, cert. denied, 353 So.2d 40; Hurst v. State,54 Ala. App. 254, 307 So.2d 62.
The granting or refusal of a motion for a new trial is a matter resting largely in the sound discretion of the trial court, and the exercise of this discretion carries with it a presumption of correctness. Ala. Dig. Key No. 911. We find no error in overruling such motion.
The refused charges, stating correct principles of law, were fairly and adequately covered in the court's oral charge, or in the given charges requested by appellant.
We have carefully examined the entire record for errors injuriously affecting the substantial rights of the appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except BOOKOUT, J., not sitting.