96 So.2d 197

James **BROWN**

v.

**STATE.**

8 Div. 786.

Court of Appeals of Alabama.

June 18, 1957.

W. A. Barnett, Florence, for appellant.

John Patterson, Atty. Gen., and Robt. G. Kilgore, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

October 26, 1955, James Brown and five others were indicted for robbing Bill Johnson of some $800. He was tried in the Lauderdale Circuit Court November 16, 1955, on a severance. The whole of the evidence was that presented by the proescution's witnesses. Conformably to the jury's verdict, the court adjudged Brown guilty of the lesser included felony of grand larceny, and after allocution sentenced him to seven years' imprisonment.

· Sometime early in the night of October 1, 1955, Mr. and Mrs. Bill Johnson, an elderly couple who lived on the Savannah Highway in Lauderdale County, were visited by two young men who wanted Mr. Johnson to go on a bond. When Mr. Johnson told them he "wasn't worth anything to go on a bond," they walked away. Mrs. Johnson, upon being examined in chief, testified that one of the visitors was James Brown. As near as we can make out from her answers on cross-examination, she recanted this identification or at least was much less positive that she had seen him then.

The Johnsons went back to sleep, Mrs. Johnson in the east bedroom and Mr. Johnson in the west. Mr. Johnson apparently had not intended to retire for the night since he had laid down on the bed with his overalls on. In his left front pocket he had a billfold containing $800 made up of one one hundred dollar bill, some twenties, tens, fives and probably two silver dollar coins. This hoard was mainly saved from his welfare checks.

· Later in the night came cries of some men asking admittance to the Johnson home on pretext of seeking help because they were "bleeding to death." Mr. Johnson unlatched the screen door and two men knocked him "winding." Mrs. Johnson meanwhile had come in from her bedroom and was seized by one of the intruders who put his hand over her mouth, held her against the door facing, and told her he would cut her throat if she hollered. The other man had her husband down on his bed. Soon her husband's assailant said, "Come on, Shorty, I have got it now." Whereupon "Shorty" broke the light bulb and the two fled into the night.

Mrs. Johnson, on being released, discovered her husband had blood running down on his face and there was a rock lying on the floor. He told her, "He has got all my money."

Mr. Johnson had very poor eyesight and hence could not point out the robbers. Mrs. Johnson, however, named Ray Murphy as her assailant and Charles Hill, Hill v. State, 264 Ala. 636, 89 So.2d 173, as the man who beat her husband.

The defendant had undisputedly been in the vicinity of the Johnson home in the company of his co-indictees (among whom were Hill and Murphy) on the night of the felonious irruption just described. The statement he gave on being arrested reads as follows:

"My name is James Brown. I live at Florence, Rt. 2. About 9:00 or 10:00 a. m. on Oct. 1st I met Roy Smith at Mike's Cafe. We went to Sheffield and drank 1 or 2 beers. We came back to Florence and about sun down, we got with Ray Murphy, Charles Hill and my brother Junior Brown. We all went to Sheffield and drank 1 or 2 beers. I don't think Smith drank any this time. We came back to Florence and headed out Savannah Road to get some whiskey. At the top of the hill beyond Cypress Creek, Geans flagged me. I don't

know his first name. I was driving my car at that time and did all the driving that night.

"Soon after Geans got in he suggested that we rob some old man and woman. I don't remember their names. He said he knew right where they kept their money. We all said we didn't want to do it. I stopped at the Natchez Trace Road and plainly told them that I wasn't having nothing to do with it. I hit Geans one lick because he was trying to get us into it. We then went on up the Savannah Highway to road that runs in front of Marvin Brown's house. Just after we turned off the highway we ran out of gas. Just after we left Natchez Trace, I told them that I would let them out but I wasn't having nothing to do with it. After we ran out of gas, Smith, Hill and I went to my uncle Columbus Brown's and got him to get some gas. When we got back with the gas Junior, Geans and Ray Murphy were at the car. Smith and I went back to Columbus Brown's, and left Geans and Ray Murphy and either Hill or Junior at the place where we had run out of gas or else that they had just walked off, I don't know which. After we left Columbus Brown's the second time we picked up Geans, Ray Murphy and Hill where the Marvin Brown road runs into the Highway. Hill was bloody on the upper arm or shoulder. Some one asked where the money was and Murphy said the woman said it was under the smoke house and they didn't take time to dig it up. We turned around and went back up the same road by my uncles to Jim Taylor's from whom we bought a ⅕ of whiskey for $3.00. The reason I went back for the boys was because I thought I would find them around there somewhere. After we left Jim Taylor's, we went to Cypress Inn and got a case of beer & then came back to North Florence. We parked at the North Florence Drug Store in the rear.

Ray went to cab stand. I followed him over there. He was gone when I got there. When I got back to the car everybody was gone and also the beer and whiskey. I got with Junior at the bus station, and we and got a cab and chased Ray but lost him. I then left Junior up town and I went on home and ate breakfast.

"I have had the foregoing statement read to me and it is true. I have not been threatened to get me to make the statement, nor have I been offered any reward or made any promises to get me to make the statement. I make it of my own free will at the County Jail on Monday, October 3rd, 1955 in the presence of Sheriff Romine, Deputy Mitchell, the jailer, T. O. Howard, and Frank V. Potts.

"James H. Brown
"Witness:
"Floyd Mitchell
"T. O. Howard
"J. Earl Romine
"Frank V. Potts"

Though we might have a mental reservation that the "1 or 2" beers he had on each of his two visits to Sheffield were understated, nevertheless we are confined to the evidence before the jury. There was other evidence of Brown's condition before and about the time of the robbery. His uncle, Columbus Brown, was a witness for the State. James Brown and two others had come to his house for help in getting gasoline for James' car. James was "pretty drunk." They all went to Mr. James Young's store, got gas and took it back to James Brown's vehicle which was stranded about three-fourths of a mile on the highway from Young's store. At the store the defendant spilled his change from paying for the gasoline and generally seemed "wobbly."

Brown submits (1) that his intoxication was of a degree sufficient to have kept him from having been able to entertain a "felonious" intent, and (2) that he was

entitled to have given rather than refused his charge A, "The offense of robbery embraces the offense of assault and battery."

With respect to that aspect of the evidence showing the effects of the defendant's drinking, the trial court gave his requested charge C:

"I charge you, gentlemen of the jury, that one of the essential elements of the crime of robbery is felonious intent. I further charge you that if you believe from the evidence in this case that the defendant, James Brown, at the time and place in question was so drunk as to be incapable of forming a felonious intent to rob, then you cannot find the defendant guilty of the crime of robbery."

He claims error in the refusal of charges B, D, and E, which read:

"B. I charge you, gentlemen of the jury, that if the jury believe from the evidence that the defendant was so drunk at the time and place in question that he was incapable of forming the purpose to do a voluntary act, then he cannot be convicted of the offense charged in the indictment.

"D. I charge you, gentlemen of the jury, that the law recognizes that a man may get so drunk that he is incapable of committing a voluntary act. I further charge you that if you believe from the evidence in this case that the defendant, James Brown, at the time and place in question was so drunk that he was incapable of voluntarily doing anything, then I charge you that you cannot find the defendant guilty as charged in the indictment.

"E. I charge you, gentlemen of the jury, that if you find from the evidence in this case that the defendant was so drunk at the time and place in question that he was incapable of forming an intent to rob, then I further charge you that you cannot find

the defendant guilty as charged in the indictment."

■ Since the defendant did not, within the contemplation of Code 1940, Title 15, § 423, enter a plea of not guilty by reason of insanity, he was not entitled to have the jury instructed on the criteria of voluntary drunkenness amounting to insanity.

Should the jury (beyond charge C, above) have been charged in effect that there can be a stage of drunkenness which, though not attaining madness, nevertheless works on the faculties of the defendant's mind or will so as to make him incapable of harboring that special or particular intent (which we sometimes call the animus furandi) which is an ingredient of larceny and robbery?

Taking of property without this special intent is but a mere trespass, a common law misdemeanor, IV Blackstone, Comm., p. 232; p. 36.

■ On a plea of not guilty to crimes (such as murder, robbery and larceny) which require a special intent, e. g., malice or animus furandi, the law of Alabama allows the jury to consider evidence of a defendant's drunkenness—not for the purpose of acquitting him *altogether*—but for the purpose of ascertaining whether or not his condition has rendered him at the time of the act capable of harboring such special intent. See Cleveland v. State, 86 Ala. 1, 5 So. 426 (murder); Chatham v. State, 92 Ala. 47, 9 So. 607 (larceny); Ray v. State, 257 Ala. 418, 59 So.2d 582 (murder); Moran v. State, 34 Ala.App. 238, 39 So.2d 419 (assault with intent to ravish). For further discussions see Weihofen, Mental Disorder as a Criminal Defense, pp. 179–182; Dir. of Public Prosecutions v. Beard, (1920) A.C. 479, 12 A.L.R. 846, and annotation at page 861 (rape); Ruse v. Read, (1949) 1 K.B. 377 (larceny); 15 Am.Jur., Criminal Law, § 340, p. 30.

Moreover, should the jury conclude the defendant thereby was not able so to in-

tend (i.e., that the State's evidence has not shown such special intent beyond a reasonable doubt), then upon a consideration of all of the evidence it must next deliberate upon such lesser offenses as are embraced in the indictment. Hill v. State, 9 Ala.App. 7, 64 So. 163. However, the trial court will not be put in error for the failure so to charge unless the defendant asks for an appropriate instruction. Code 1940, Title 7, § 273; Peterson v. State, 227 Ala. 361, 150 So. 156; Burden v. State, 20 Ala.App. 387, 102 So. 464.

■ Charge B, above, is *partially* adapted from charge 8 in Hill v. State, supra. However, whereas it concludes "then he cannot be convicted of the offense charged in the indictment," charge 8 in Hill ended "then he cannot be convicted of any offense higher than manslaughter in the second degree." We think the difference significant; the expression, "offense charged in the indictment," we construe to mean not only robbery but also lesser included crimes.

Therefore, since robbery includes offenses in which special intent is not an ingredient, requested charges B, D and E were properly refused, Cleveland v. State, supra. Thus, as we view Maddox v. State, 31 Ala.App. 332, 17 So.2d 283, voluntary drunkenness as a defense to assault and battery must amount to insanity. We quote from James v. State, 193 Ala. 55, 69 So. 569, 572:

"In this connection it is to be noted that insane conduct or mania resulting merely from present intoxication is not the insanity which excuses crime. —Gunter v. State, 83 Ala. 96, 109, 3 So. 600; Parrish v. State, 139 Ala. [16] 47, 36 So. 1012; Buswell on In-

sanity, 449. All of the alleged abnormal conduct and conditions of defendant, offered to be shown by the several witnesses, were directly associated with present drunkenness, excepting only the instance of fever above referred to. So there was in fact no evidence before the court tending to show any fixed insanity, resulting from drunken habits or otherwise.

\*      \*      \*      \*      \*      \*

"Refused charge 3 is palpably misleading in its suggestion of complete acquittal because of defendant's intoxication. On the undisputed evidence there could be no acquittal on the plea of not guilty."

■ Charge A, while a correct statement of the law, is not followed up with a minor premise for the jury's direction; accordingly, its refusal in abstract form is not error, Holloway v. State, 37 Ala.App. 96, 64 So.2d 115.

■ In addition to the questions above discussed, we have examined the law as to combinations in view of the evidence that the defendant was not among the nocturnal interlopers at the Johnson home when the money disappeared. We have come to the conclusion that the question as to whether or not the defendant, certainly as the chauffeur for his associates, was thereby an aider or abetter—a derivative principal under the statute (Code 1940, Title 14, § 14)—was for the jury, Davis v. State, 36 Ala.App. 573, 62 So.2d 224.

As required by Code 1940, Title 15, § 389, we have searched the record and failing to find error conclude that the judgment of the circuit court is to be

Affirmed.