Burglary: two years; Probation: three years, six months of which to be served in the county jail.
On January 19, 1978, Margaret Webb lived in an apartment at 1614-A Oak Street in Montgomery, Alabama. She was working at Maxwell Air Force Base at the time and her duty hours were from 7:00 A.M. to 7:00 P.M. On the date in question, she had left her house to go to work sometime before 7:00 A.M., and prior to leaving, she was certain that all the windows and doors were locked. About 1:30 or 2:00 P.M. she received a call from the police department, left her job and went home. Upon her arrival, she noticed that the back window had been broken and "the back door was open." She testified that her sewing machine, which was kept in the bedroom, had been moved and was "at the window." Further, she said that her Panasonic stereo, including an amplifier and two speakers valued between $550.00 and $600.00, was missing.
Ms. Webb stated that, later on the same day, Detective Hayward Huffman showed her a stereo set which she identified by the serial numbers as that taken from her apartment.
During the trial, she said she did not know the appellant, Gregg Smith, Isaac McGhee or Theodore Thomas and had not given the appellant or any of the others permission to enter her apartment and take the stereo.
Detective Hayward Huffman of the Montgomery Police Department testified that, on January 19, 1978, he became involved in the investigation of a burglary at the home of Margaret Webb. According to Huffman, when the police went to the Webb apartment, he had noticed that the kitchen window had been broken and opened and that it appeared that someone had entered the apartment through that window. Further, the apartment had been "ramshackled," drawers opened and "things moved out of place."
Huffman testified that Ms. Webb had told him that a stereo was missing and said he noticed that a sewing machine had been moved "from the bedroom to the kitchen near the window." He said that he had received information from a resident of the neighborhood where the apartment was located which produced the license plate of a "van" seen "on the side of the Webb apartment."
Huffman testified that, on the day of the incident, he saw the appellant, Sherman Pugh, at 4041 Gauge Street standing near a van which bore the license plate number he had received from the witness. He recalled that the appellant was standing near the back door of the van and was with three juveniles. Huffman said that the back door of the van was open and that he saw a stereo and speakers inside. He stated that the speakers and the stereo were removed by the police and that, when they were shown to Ms. Webb later, she identified them by their serial numbers.
Huffman said he took Pugh into custody "sometime after four o'clock" on the afternoon of the incident.
During cross-examination, Huffman acknowledged that the police had received "an anonymous telephone call" concerning the burglary and that he personally received the information concerning the license plate number of the van. Further, Huffman said he had learned that a Mr. Edgar Spear lived at 4041 Gauge Street and that the van used by the appellant was owned by Mr. Spear.
Huffman stated that, when he arrested the appellant, two other "black males" were arrested at the same time. He said that a fourth person, Theodore Thomas, a juvenile, was not present at the time, but was arrested later, and that the other two males were Gregory Smith and Isaac Dwight McGhee. Huffman added that the appellant, Sherman *Page 1137 
Pugh, was thirty-one years of age, Gregory Smith was seventeen and Isaac McGhee was sixteen at the time of their arrest.
Isaac McGhee, seventeen years of age, stated that he lived at 3112 West Smiley Court in Montgomery, Alabama. He said that Sherman Pugh, Gregory Smith and Theodore Thomas were friends of his, that they were all members of a band, and that the appellant, Sherman "Pie" Pugh was the leader of the band.
McGhee said that he recalled the day they went to Margaret Webb's apartment on Oak Street and stated that they had gone into the apartment on two occasions. He testified that, on the first occasion, "Cookie" (Theodore Thomas) and "Pappa" (Gregory Smith) had accompanied him, and stated that the appellant did not accompany them and was not waiting outside when they entered the Webb apartment.
According to McGhee, he was on his way to his grandmother's house at the time they entered the Webb apartment on the first occasion. He said that the three of them went inside and "ate some cookies" but did not take any goods or property on that occasion. He stated that they saw the stereo but did not remove it.
The witness said that "about an hour or two" later they "got up with" the appellant. They then went back to the apartment and he, Gregory Smith and Theodore Thomas went inside the second time.
According to the witness, the appellant drove them to the apartment in a van which belonged to Edgar Spear. McGhee testified that the van was parked on the side of the apartment and said that the appellant never went into the apartment nor did he get out of the van. McGhee said that on the second occasion, he and the two other juveniles went in through a door, which had been left open or unlocked after they entered the apartment originally. He said that "Cookie [Theodore Thomas] busted a window in the back," and let Smith and him in.
McGhee recalled that Thomas had opened the door on the first occasion, and he remembered seeing Smith go in through the door first on the second occasion. Further, he said that all three had entered through the door the second time they entered the apartment.
McGhee testified that he did not remember whether or not the door was "shut" when they returned to the apartment and that, all he remembered was "that we went in, and I did not see nobody open no door or nothing." He also acknowledged that the appellant knew that none of the three lived at that apartment. McGhee stated that the only thing that the appellant said to them was "hurry-up."
The witness testified that the stereo and speakers were then taken from the apartment and placed in the van and they drove away. He stated that they were going to sell the stereo and had gone first to Linda Williams' home, and then to Spear's residence, where they were apprehended by the police. According to McGhee, all of those involved in the theft, including the appellant, were engaged in the "dealing" involving the sale of the stereo.
During cross-examination, McGhee said that he knew Lilly Burton and that he had called the appellant from the Burton house. He acknowledged that, at the time he made the call to Pugh, he had asked the appellant to come and pick him up. He said that he did not tell the appellant that he was going to break into any house or take anything at that time.
According to McGhee, after he called the appellant, the three juveniles walked to his grandmother's house and then went to the apartment and broke in. He said that they did not take anything but "[j]ust looked at the speakers."
McGhee testified that he picked up the sewing machine but that he "put it back down." He said that he did not remember whether or not he had moved it but did not believe that he had. Further, he stated that he did not see anyone else pick up the machine on that occasion. *Page 1138 
McGhee testified that, after they left the apartment on the first occasion, they went to his grandmother's house where the appellant "showed up." He said that they did not make any telephone calls to locate the appellant after they left the apartment on the first occasion.
The witness denied that he had promised to bring Linda Williams a stereo and said "[n]o sir. I did not tell her that."
McGhee said that he did not remember any conversation he had with the appellant when he first got into the van but said they did discuss going out of town to "book a `gig,'" or arrange "a job at some club." Further, he said he remembered that the appellant had talked about taking a person named Vicki Sullivan to the doctor. He said he could not remember whether or not they "had planned on band practice that afternoon."
The witness testified that he was "on probation from the Juvenile Court," but said that he had made no "deal" in exchange for his testimony at the appellant's trial. Further, he denied making any statement that he hoped the appellant would "get time" out of this charge.
McGhee denied making any statement to Gregory Smith or Theodore Thomas that he wanted to get the stereo when the appellant arrived. He testified that the only thing he said was "these speakers are big. I have never seen anything like them." McGhee admitted making the statement that he would like to have the stereo for himself. However, he said he made the statement only when Edgar Spear told him that he (Spear) could not buy it.
On re-direct examination, McGhee stated that the appellant had talked with Edgar Spear about buying the stereo. He acknowledged that the appellant had said something to him "about was he going to get a cut of the deal." He added that the appellant had told them "he would sell it, and he would get some of the deal, some of the money. And we said yea."
During the trial, the witness identified State's Exhibit No. 1 as the statement he had signed and given to the police. He acknowledged that the statement concerned "all [that] happened in the burglary" and that it was given on the same day they were apprehended by the police.
On further cross-examination, McGhee testified that he had carried the stereo over a fence to the van and that the appellant was waiting in the van. Further, he said that the appellant told him to "hurry up."
McGhee also stated that, although his statement to the police did not reflect that he told the appellant he was going to break into the apartment, he did tell the appellant this.
He recalled that, when they passed the apartment, they had asked the appellant to stop, and acknowledged that appellant "did not know anything at that time." The witness explained that, "he (the appellant) didn't know until we told him. We showed him where the house was." Further, McGhee acknowledged that he told the appellant that they "had to go in [to the apartment] and get some speakers." McGhee said that, although he did not mention it in his statement to the police, he had told the appellant at the time either that they were going to break into the apartment or that they intended to steal something.
McGhee stated that, when he told the appellant he had second thoughts about taking the stereo, the appellant had said "no. You are all going to get it. Go ahead and do what you got to do and hurry up."
Also, McGhee acknowledged that the appellant, at the time the stereo was placed in the van, knew what it was and had "all of the information about it." At the conclusion of McGhee's testimony, the State rested and the appellant moved to exclude the State's evidence and for a directed verdict. The defense took the position that the State had offered insufficient testimony to make out a prima facie case.
The appellant then called, as his first witness, Theodore Thomas. Prior to the taking of any testimony from this witness, a discussion was held out of the presence of *Page 1139 
the jury, during which the prosecutor informed the court that the witness was one of the three juveniles involved in the burglary, and that his testimony might serve to incriminate him.
The court, at that point, appointed an attorney to discuss his rights with Thomas as well as the significance of making a statement in court that might incriminate him.
Subsequently, the court called the appointed attorney and Thomas to the bench and, at that time, the attorney told the court that he had discussed his rights with Thomas and the fact that he could possibly be charged with the offense later. Further, the attorney stated that he had informed Thomas that, if he took the stand, he could be cross-examined and anything he said could be used against him at a later time.
On inquiry by the court, Thomas informed the court that he understood what the attorney had explained to him and stated that he did not want to testify. The defense attorney then asked Thomas if he wanted to testify and Thomas replied "no."
On further questioning by the defense attorney, Thomas agreed that, if his case was "over," he would be willing to testify. At that point, the defense attorney made a motion for either a continuance or a grant of immunity by the district attorney's office, on behalf of the witness, Thomas. He explained that Thomas' testimony was crucial to the defense of the case.
The district attorney, at that time, stated that his office did not have the authority to give Thomas immunity and the court subsequently denied the motion for continuance.
At that point, the jury was returned to the courtroom and the defense called Gregory Smith. Smith testified that his residence address was 2447 Stephens Street, but that he currently was living "in jail." He stated that he was seventeen years of age and had been involved in the burglary at 1614 Oak Street.
According to Smith, he, McGhee and Thomas had gone to the address and that Thomas knocked on the door and, when there was no answer, went around to the back and threw a rock through the window. Thomas opened the back door and he and McGhee entered the apartment.
Smith said that the appellant was not with them at that time and that, when they left the apartment, they walked to "Highland Village," where McGhee made a telephone call to [Edgar] Spear's house to tell "Pie [the appellant] to come pick us up on the van." Smith said that Spear told them that the appellant "was on the way." Smith explained that McGhee thought that "the speakers were too big to tote" and wanted to transport the speakers in the van.
Smith recalled that McGhee told them "Spear [says that] `Pie' [the appellant] is supposed to be out there already looking for us." They then went outdoors and saw the appellant coming down the street and stopped him. According to Smith, they got into the van and drove around for awhile and McGhee asked the appellant to "take [him] to pick up some speakers."
Smith testified to the following exchange:
 "And Pie said he couldn't do it, you know. He had to take his niece to the doctor. And Isaac [McGhee] said, `let me borrow the van, and we will take you and Vicki to the doctor and come back and pick you up.' And `Pie' [said] he couldn't do that, because Spear did not want Isaac to have the van. So he did not do it."
The witness stated that there had been no plan to break into the apartment and said that McGhee had told him that he had promised the stereo to Linda Williams. Smith said that, when the three juveniles went in to get the stereo, on the second occasion, no one had discussed the stolen property with the appellant. He said that, after taking the stereo from the apartment, they placed it in the van and drove away.
Smith said he did not remember the appellant making any statement about the stereo and that he appeared to be acting in a normal manner at that time. *Page 1140 
The witness stated that the stereo was taken "home to Linda Williams' house," and that, after McGhee had made a telephone call to Spear, the appellant left in the van "with somebody." Smith said he stayed behind with the stereo and that, subsequently, the appellant returned and told them Spear had told him to bring the stereo "down there."
Further, Smith said that McGhee had reported that they were going to sell the stereo for seventy-five dollars and that only three people would be involved in the exchange of the money — McGhee, Thomas and himself. According to Smith, at that time, someone had said "if they make an offer to Spear, there would be enough money for Pie [the appellant]." Smith denied that the appellant had asked him to take the stereo to Edgar Spear's house.
The witness stated that he did not hear the appellant say anything concerning selling the stereo. However, Smith did say that he thought the appellant expected some money for helping them. He admitted that the appellant could have known that the stereo was stolen, but did not know for sure whether the appellant knew or not.
Smith said that, after the police talked to McGhee, they had shown him McGhee's statement and he had "agreed" with it. During the trial, he identified the signed statement that he had given to the police, which was offered as State's Exhibit No. 2.
At that point, the jury was dismissed from the courtroom and a voir dire hearing was held to determine the voluntariness of the statement given to police by Smith. After the hearing, the court determined the statement to be admissible, the jury was returned to the courtroom and Smith was questioned regarding the statement. At that time, he acknowledged that the statement he had given to the police was in agreement with that given to the police by Isaac McGhee, but stated that he had not been shown McGhee's statement.
Sherman Pugh, the appellant, took the stand in his own behalf and testified that he knew Isaac McGee, Gregory Smith, and the person named Theodore Thomas who was commonly called "Cookie." He explained that the first time he saw Theodore Thomas was on the date the apartment was burglarized.
The appellant testified that he remembered the day when the burglary occurred and stated that he was at his girl friend's house when he received a telephone call from Isaac McGhee, asking him to "pick them up." The appellant explained that McGhee and the others knew that they were to have band practice on that day.
The appellant stated that he left his girl friend's house and gone to Highland Village where he picked up McGhee, Smith and Thomas. The appellant said that, at that time, McGhee and Thomas got into the van and asked him to pick up some speakers for them. The appellant explained that, whenever they had band practice, they usually brought "small speakers to attach to the instruments to get a better sound."
The appellant stated that there was "a little misunderstanding" about picking up the speakers because he had an appointment to take his to the doctor. Appellant said, however, that Isaac McGhee "convinced" him and they "went around to Stella Street" to pick up the speakers.
He said the two juveniles told him that they were going to an apartment and when they returned to the van they had a big stereo and speakers. Pugh testified that, before they went into the house, they did not tell him "that they were going to burglar in the daylight time at twelve o'clock."
The appellant went on to comment:
 "If I was going to pull of a burglary, I wouldn't pull it off at twelve o'clock in the daytime like they were teenagers. And I did not influence them to do that. And I had no idea."
Appellant stated that, when they returned with the stereo, he asked them "what was going on with the stereo" and they told him "move on, move on, because we done broke into an apartment and stole it." *Page 1141 
According to the appellant, he drove off because he was afraid to stay there and put the stereo back, "because anytime you pull off a robbery like that in the nighttime on T.V., you be killed."
He claimed he was not guilty of the burglary and testified that, if he had known the others were going to steal the property, he would never have gone to the apartment with them. He went on to state that he had not had any trouble with the three juveniles taking anything or "where they were coming around me with any stolen property or anything like that; no." He added that, when they went out of town to entertain, there had been "one little incident where they went over to a five and ten-cent store and steal cookies and candy bars; and I would get them about that."
The appellant said that, when he told the three to get out of the van, they pleaded and said "no, no, no. . . . please take me over to Linda Williams' house and everything will be all right." Appellant said, at that point, he felt there was nothing else to do but to take them where they asked to go.
According to appellant, when they arrived at Linda Williams' house, he never touched the stereo at any time and the three juveniles took it out of the van into her house. He said the three teenagers discussed the stereo for "about . . . an hour" and then Linda Williams told them to get the stereo out of her house. She further said that, if they didn't, she was going to call the police.
Appellant said that, when the stereo was removed from Linda Williams' house and placed in the van, he called Edgar Spear because the van belonged to Spear. The appellant said he explained to Edgar Spear that Isaac McGhee and the other two had taken the stereo out of an apartment and put it in the van, and he asked Spear what he should do. He said that he told Spear the three were "trying to make a deal" and asked if Spear "wanted to buy it." Appellant said Spear told him, "just bring them down here to the house," and that is what he did.
The appellant denied that he had any intention of getting any reward or money from the stereo and stated that his whole intention was to "get rid of" the stereo. Further, he said it was his intention to protect the van and himself. He testified that he had never stolen anything before and did not then feel like he had stolen anything, under the circumstances.
The appellant said that on arriving at Spear's house, Isaac McGhee began talking to Spear about the stereo, and that he had not taken part in the transaction. He said that the juveniles had offered him a price when he told them to get the stereo out of the van.
The appellant testified that, when he was arrested, he had given the police a statement which he had signed. He stated that he was not allowed to make a telephone call and was not told he had a right to remain silent, or asked to sign a statement waiving his Miranda rights.
During cross-examination, the appellant testified that Smith and McGhee did not work or go to school. Further, he said that he was not employed and stated that "[t]he only thing I was doing was working with the band."
The appellant further stated that he did not tell the three juveniles involved that he knew a place where they could get more money for the stereo. He said it was untrue that they had discussed giving him twenty-five dollars from the sale of the stereo. Further, the appellant denied telling McGhee ". . . if you all are going to get it, go ahead and do what you got to do and hurry up."
He also denied asking Spear whether he (Spear) wanted to buy the stereo set. The appellant said, "I told him Isaac [McGhee] and Gregory [Smith] told me to ask him do he know anybody that wants to buy it."
Lillian Pugh was called next by the defense and testified that the appellant was her son. She testified that he was "honest" and that she had never known him to steal anything or break into anyone's home. *Page 1142 
Gregory Smith was recalled and testified that, after the appellant had telephoned Spear, appellant did not tell him that he (appellant) had tried to sell the stereo to Spear, but that Spear did not want it. Smith went on to say that, after the call, McGhee had told him, in the appellant's presence, that the appellant said "Spear said bring the component set down there, and he would get more money for it."
Lilly Burton was next called and testified that she knew all the individuals involved. She stated that she knew the appellant's general reputation in the community and that she had "never heard anything bad" about the appellant.
Vicki Sullivan was then called and testified that the appellant was at her home on January 19, 1978, and that she remembered his receiving a telephone call. She stated that, after the call, they both left in the van and she was taken to the doctor. She testified that the appellant was suppose to return and pick her up but that he never came back.
Upon being questioned about the appellant's reputation for honesty and veracity in the community, Ms. Sullivan stated, "I never knew him to steal or nothing like that."
Edgar Spear testified that he had known the appellant for "about eight years" and had "worked with him with a band for about five years." Further, he said the appellant's general reputation in the community was good.
During cross-examination, Spear said the appellant had called him but did not tell him the stereo was stolen. He said that, when the appellant called him, he asked "did I [Spear] want to buy it, and I said no."
Spear said that the appellant did not mention a price, but only said that it was very expensive. According to Spear, appellant mentioned a value of "about twelve hundred dollars."
Spear admitted that he had talked to McGhee also, but could not say whether he had talked to the appellant or McGhee first. He did say that neither of them had told him that the stereo was stolen.
The appellant was recalled and denied making any statement to Spear concerning the fact that he wanted Spear to buy the stereo. At the end of appellant's testimony, the defense rested and the State called Detective Haward Huffman in rebuttal.
Huffman identified State's Exhibit No. 4 as the "Rights form," or waiver form, used in advising the appellant of his constitutional rights. Further, he stated that the appellant had signed the waiver form and that he had advised the appellant that he was under investigation for burglary and grand larceny.
Huffman stated that, when the appellant was taken into custody, he had warned him of his constitutional rights, "orally," and that later, at the police station, he warned him of those same rights again when appellant executed the waiver form.
Huffman said that the appellant was allowed to make a telephone call and that he believed the appellant had called his parents.
The witness identified State's Exhibit No. 3 as the statement he had taken from the appellant. Huffman said that the appellant was permitted to review the statement before he signed it and that, after reading the statement, the appellant had signed it.
During cross-examination, Detective Huffman acknowledged that the appellant did not tell him that he (the appellant) knew that the stereo had been stolen before the three juveniles loaded it into the van. Huffman also acknowledged that the appellant had told him that he knew the stereo and speakers were stolen after they were loaded into the van, but not before.
 I
The appellant contends that the trial court erred in not granting his motion to exclude the State's evidence and in not directing a verdict for the appellant. He argues that the evidence was insufficient to support the charge of breaking and entering in the indictment even on a theory of aiding and abetting. He also maintains *Page 1143 
that the appellant's possession of the stolen property was sufficiently explained to overcome any inference that the appellant was connected with the burglary.
Under the law in Alabama, when a breaking and entering is shown by evidence and it appears that, at the time of the breaking, certain property was stolen which is later found in possession of the defendant, this, if unexplained to the satisfaction of the jury, would be sufficient to support a judgment of guilt. Holcomb v. State, 26 Ala. App. 593,164 So. 300.
The settled rule in this State is that the possession of recently stolen goods in a burglary creates a "circumstance or inference" for the jury's consideration. Buckles v. State,291 Ala. 359, 280 So.2d 823. It is the province of the jury to determine whether his explanation of the possession is reasonable and true. Comer v. State, 28 Ala. App. 470,188 So. 691; Berry v. State, 22 Ala. App. 168, 113 So. 626.
Further, it is also a question for the jury whether the accused's presence at the burglarized building was a coincidence or was the result of a concerted action between the parties. Layne v. State, 32 Ala. App. 34, 21 So.2d 553.
In Parsons v. State, 33 Ala. App. 309, 33 So.2d 164, 167, this court stated:
 "The participation in a crime and the community of purpose of the perpetrators need not be proved by direct or positive testimony, but may be inferred from circumstantial evidence." Cited in Gray v. State, 52 Ala. App. 481, 294 So.2d 448.
See also, Patterson v. State, 234 Ala. 342, 175 So. 371; Brownv. State, 39 Ala. App. 149, 96 So.2d 197.
In the present case, it is undisputed that there was in fact a burglary committed at the apartment of Margaret Webb, and that a stereo with speakers was taken. The stereo and speakers were later found in the possession of the appellant and three juveniles when they were apprehended in the van.
It is also undisputed that the three juveniles who broke into and entered the apartment of Margaret Webb were, on the second occasion, taken to the Webb apartment by the appellant in the van borrowed from Edgar Spear. While the appellant waited outside in the van, the three boys entered the house and returned with the stereo and the speakers. After placing the stereo and the speakers in the van, the trio were driven away by the appellant. When they were apprehended sometime later, they were all standing at the back of the van with the door open and the stereo was in plain view.
The appellant admitted that he had made a telephone call in an effort to sell the stereo, but maintained that it had been done at the request of the three young burglars. Whether the appellant knew the intention of the trio when he drove them to the Webb apartment is an issue raised by conflicting evidence and poses a question for the jury. Layne v. State, supra.
Also, the appellant's complicity in the burglary is a question for the jury. Clifton v. State, Ala.Cr.App.,359 So.2d 853. In the present case, one of the three burglars, Isaac McGhee, testified that the appellant "knew" they were going into the Webb apartment to steal the stereo. Further, it was shown that the appellant participated in the attempt to sell the stereo to Edgar Spear, and that he was to receive some twenty-five dollars of the money if the stereo was sold.
Based upon the foregoing, the question of the appellant's complicity in the burglary was properly put to the jury. Whether his explanation of the recent possession of the stolen stereo and speakers was satisfactory was a question for the jury. Therefore, it is our judgment that the motion to exclude and what the appellant terms a request for a directed verdict were properly overruled.
 II
The appellant insists that the trial court committed reversible error when it did not grant his motion for a continuance or a mistrial. He complains that, after his first *Page 1144 
witness, Theodore Thomas, one of the co-defendants and a juvenile, was determined not to be available as a witness, he should have been granted a continuance so that the witness could be charged and tried. Alternatively, he insists that he should have been granted a mistrial because the prosecution refused to grant the witness immunity or state that he would not be prosecuted, when it was shown that Thomas' case had been "informally adjusted" in the juvenile court.
The question of a continuance is addressed to the discretion of the trial judge and, unless there is a clear abuse of discretion, it will not be reviewed on appeal. Pounders v.State, 55 Ala. App. 204, 314 So.2d 123; Jordan v. State,56 Ala. App. 55, 318 So.2d 793.
The matter of granting a mistrial, too, comes within the sound discretion of the trial judge, because he is in a better position to determine whether or not it is warranted. Shadle v.State, 280 Ala. 379, 194 So.2d 538.
As can be seen from the foregoing portions of the transcript of evidence, the court, as was its duty, made the witness, Theodore Thomas, aware of his constitutional right not to incriminate himself. The court advised the witness of his rights, which were constitutionally protected, and, prior to going forward with any questioning, appointed an attorney to aid the court in acquainting the witness with those rights and in making a decision whether or not to testify.
Under these facts, it is our judgment that the court had no other choice but to make this witness aware of his constitutional rights and provide him with the necessary legal counsel so that he could make a knowledgeable decision.
Although we agree that the appellant has a constitutional right to compulsory process, this right must give way to a witness' constitutional right not to incriminate himself in testifying.
After this witness made it known to the court that he did not wish to testify because his testimony might incriminate him with regard to any charge that might be forthcoming, the trial court had no alternative but to excuse him as a witness.
Appellant's contention that the prosecuting attorney should have granted the witness immunity, was addressed in an opinion written by Presiding Judge John O. Harris, in Will Ed Gipson v.State, Ala.Cr.App., 375 So.2d 504, affirmed, Ala.Sup.,375 So.2d 514 (1979). There, Judge Harris commented:
 "The district attorneys are utterly without authority and power to grant an accused immunity from arrest and prosecution for violating our criminal laws. To clothe them with such power and authority would strike at the very heart of our system of criminal justice and oust the courts of powers vested in them by the Constitution and statutes."
In view of the foregoing, the trial court did not abuse its discretion in refusing to grant a continuance or motion for a mistrial, and its denial of these motions was proper.
 III
We have reviewed the transcript of evidence and it is our judgment that the evidence raised questions of fact for the jury and that, if such evidence was believed, it was sufficient to sustain the conviction. Young v. State, 283 Ala. 676,220 So.2d 843; Haggler v. State, 49 Ala. App. 259, 270 So.2d 690. Based on the foregoing, the court's denials of the motion to exclude, the appellant's request for a "directed verdict" and the motion for a new trial were proper.
We have searched the record and transcript of evidence and have found no prejudicial error. Therefore, the judgment of conviction by the Montgomery Circuit Court is affirmed.
AFFIRMED.
All the Judges concur. *Page 1145