LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty under an indictment which, omitting the formal parts thereof, charged as follows:
“Archie Peoples, whose name is otherwise unknown to the Grand Jury other than as stated, did, in the course of committing a theft of lawful money of the United States and a shotgun, the property of Gafford Dandridge, use [sic] force against the person of Gafford Dandridge or against the person of another present, with intent to overcome his physical resistance or physical power of resistance, while the same, Archie Peoples was armed with a deadly weapon, to-wit: a shotgun, in violation of Section 13A-8-41 of the Code of Alabama,.... ”
After adjudging defendant guilty and a sentence hearing, the court sentenced him to imprisonment for life. A violation of Section 13A-8-41 of the Code of Alabama is a Class A felony, which, according to § 13A-5-9(a)(3) calls for punishment “by imprisonment for life or for any term of not more than 99 years but not less than 15 years.”
No contention was made by defendant on the trial, and no contention is made by appellant, that the crime alleged in the indictment was not committed by someone. The only factual contest is as to whether the appellant-defendant committed the robbery. He did not testify; two of his sisters and a brother-in-law testified that he spent the night in Birmingham on the night of the robbery, November 21, 1981, the robbery having occurred at the home of the alleged victim and his wife and grandchildren a short time after 10:00 P.M.
*1209 Appellant presents three issues as a basis for his contention that the judgment of the trial court should be reversed. All three of the issues, however, are directed at the action of the trial court in overruling a motion for a continuance of the case, which was presented after the State had rested and after defendant had presented the testimony of his witnesses as to an alibi, and one other witness had testified on call of defendant as to what the alleged victim had indicated after the robbery as to whether the defendant robbed him. We now set forth that part of the transcript showing the motion, the ruling of the court thereon, and the context thereof:
“(Whereupon an off-the-record discussion was held between counsel and the Court.) “MR. CROMER [Defendant’s appointed trial counsel]: Like I told you, Your Hon- or, we had subpoenaed a witness that the Clerk showed service on by the name of John Chapman who was told to be here today and we feel he’s necessary to our case. I don’t know where he is. He was subpoenaed and the return is shown by the Clerk and served by the Sheriff’s Department. We don’t have him in Court at this time. We feel at this time that we do need him.
“THE COURT: His testimony is similar to what you have already put on; is that correct?
“MR. CROMER: No, sir; we feel it’s somewhat different. It’s the identity of Archie Peoples.
“THE COURT: What efforts have you made to get him here today?
“MR. CROMER: We told the Sheriff this morning when we first got here that we were looking for him. He checked the return again to see that it said that he was to be here this morning, the seventeenth of August. He lives in Arlington, Alabama.
“THE COURT: Has there been any effort made to contact him today?
“MR. CROMER: Before the case started this morning at 11:00, Your Honor.
“THE COURT: Has anybody called over there this morning?
“MR. CROMER: We called the roll this morning and thought that he would be here by this time. Now that’s the only remedy we have is to have the subpoena issued and it shows a return on it.
“THE COURT: I understand that. You have to show some effort on your part to get him here. You wait until you need him and you want me to stop this case while you go looking for him. I don’t think I can do that. I’ll have to insist that you go forward.
“MR. CROMER: We except. We rest, Your Honor.”
Under the captions of “Supplemental Documents Together With Explanation” and “Supplemental Documents Explanation” at the conclusion of brief of counsel for' appellant is the following paragraph:
“Although not included in the record on appeal, appellant has specifically requested that appellant’s counsel include in this brief a photocopy of appellant’s petition for writ of habeas corpus. Counsel realizes that the proceedings are different from this appeal. Yet, counsel feels a duty to grant appellant’s request. It is the appellant’s life which is in the balance. Appellant has requested his counsel to include the petition in order that ‘the Court might understand what has really gone on.’ ”
Immediately thereafter in said brief, are copies of two separate pro se petitions of this appellant as petitioner and his trial attorney as respondent, which petitions are captioned “Petition for Writ of Habeas Corpus,” each filed with the Clerk of the Wilcox County Circuit Court, one filed on February 11, 1983, and the other on February 16, 1983, which petitions are substantially, if not precisely, the same. The petition contains averments of failure on the part of petitioner’s trial attorney to “perform his duty to see that his client received a fair and impartial trial” and includes the following paragraph:
“The petitioner ask that [his trial attorney] return the money paid to him back to the state and the taxpayers for breach of trust and the petitioner ask the court *1210 order [his trial attorney] to show cause for his neglect to his client and pay punitive damages totaling the sum of $200,-000.00.”
Included also in the petition are averments that “petitioner requested a change of venue, because there were a lot of publicity about him and the said charge, but, [his trial attorney] made no effort to enter a motion for his request.” The petition also avers that, “the petitioner want the defendant [appellant’s trial attorney] fired from case and to release all materials pertaining to the petitioner charge and trial,” and that petitioner “requested to have a continue to allow the witnesses to be present, but, the defendant [appellant’s trial attorney] refused to get one.” The petition contains an allegation also that “there were jury tampering in with the selection of jurors, but, [appellant’s trial counsel] refused to ask [the trial judge] to declare the verdict a mistrial.”
We were at first disposed to ignore in this opinion the references to the “Petition for writ of habeas corpus” as they are not germane to this appeal, but we have concluded that fairness to all concerned requires our inclusion of such references, which regrettably will result in a more lengthy opinion than otherwise.
Appellant’s counsel makes a strong argument to the effect that the trial court should have continued or suspended the trial for a sufficient length of time for the appearance of John Chapman, the subpoenaed witness. He argues that “as a result of the ruling of the court, Counsel was unable to show conclusively how the Dan-dridges’ identification was tainted by someone suggesting to them that it was Archie Peoples.” We now proceed to consider the testimony of the Dandridges as to their identification of the defendant as the alleged robber and as to whether their “identification was tainted by someone suggesting to them that it was Archie Peoples.”
Mrs. Dandridge, 68 years of age, testified that after 10:00 P.M. on the night of the robbery, she was in bed and heard a knock at the door. She went to the door and was told by someone from the outside that “his wife was having a baby,” then she opened the door, and the man at the door told her that “he wanted a spread,” then he followed her out of the living room into the children’s bedroom and gave him the spread, then the man told her “to hurry up, that his wife was bleeding.” She testified:
“Q. Now as you were walking out of the children’s room, did anything else happen? Did anything happen?
“A. I walked out of the children’s room and he demanded money.
“Q. So as you were walking out of the children’s room you heard—
“A. (Interposing) He throwed the spread down.
[[Image here]]
“Q. What did the voice say?
“A. ‘Give me your money.’ I said, ‘You going to do me that way? My own color going to do me that way?’ That’s the word I spoke to him.
“Q. All right. And what happened after that?
“A. He just asked for the money and demanded the money and he pulled back his coat.
[[Image here]]
“A. He pulled the coat back like this on the right side. He had that sawed-off shotgun under the coat.
[[Image here]]
“Q. So was this gun pointed at you?
“A. That’s right. He had it pointed at me. When he demanded the money, he told me to tie my husband up.
“Q. So did you tie your husband up?
“A. I had to tie him. I’m going to tell it like it was. I tied him up.
[[Image here]]
“Q. Did your husband give him the money?
“A. He had his hands tied. He reached under his pillow and gave him the pocketbook and he took it out and throwed the pocket book there on the bed.
“Q. So what was your husband doing, was he sitting on the bed?
“A. Sitting on the bed.
*1211 [[Image here]]
“Q. So after you saw your husband give this person his money, what happened after that?
“A. I told him, I said, ‘You’ve got the money, why don’t you go on.’ That’s the time he went out the door. When he went out the door, he came back and he busted the latch off the door. I didn’t let him in that time.
“Q. When the person went out the door, what did you do?
“A. I went back right behind him and latched my door, but I didn’t fix it like I generally fix it. He just busted the latch out and came on back.
“Q. This person came back inside your house?
“A. Yes. He brought another man with him.”
The witness further testified that the man, who took the money and went out the door and returned with another man, took the shotgun from the wall of the house (not the shotgun he had the time he entered the house) and the two men left. She identified the defendant as the first of the two men. She testified:
“Q. You said you got a good look at this person?
“A. That’s right.
“Q. Have you seen that person since then?
“A. Yes, sir; I see him today.
“Q. Where is he?
“A. Right over there.
“Q. You are certain that’s the person that came into your house that night?
“A. I’m certain.
“Q. You have no problems with that at all?
“A. I ain’t got no doubts about it.
[[Image here]]
“Q. Where were you when you learned or you heard the knock on the door?
“A. I was in my bed.
“Q. He [her husband] was in the bed, too?
“A. He was too.
“Q. Did he hear the knock at the door?
“A. I don’t know whether he did, but I did.
“Q. But you think he was asleep?
“A. He was probably asleep. I don’t know whether he was or not.
“Q. Did he get up when you went to the door?
“A. Nobody got up but me. I went to the door.
“Q. Did you have any lights on in the house at this time?
“A. I had a light on in my room.
[[Image here]]
“Q. How long did all this take, if you recall?
“A. Didn’t take long.
“Q. Ten minutes or fifteen minutes?
■ “A. I wouldn’t know about that.
“Q. I mean, your best judgment.
“A. Probably be ten or fifteen minutes. I don’t know.
[[Image here]]
“Q. (Continuing): Did you know the Defendant’s brother?
“A. No, I don’t know none of them.
“Q. How did you know it looked like his brother?
“A. I just said it looked that way.
“Q. Oh. But you said some of your children said that it was him?
“A. My children didn’t tell me that. I know it was him. My children ain’t told me that.”
Mr. Gafford Dandridge, 72 years of age, testified at length and in detail as to the incident, particularly as to the taking of the money. He had gone into another room of the house at the time of the taking of the shotgun on the wall. The witness testified:
“Q. Did you report this robbery?
“A. After they called the police.
“Q. Who called the police?
“A. My daughter, Darleen, walked up to Thomas’ to the Thomas house and Twilly was the man who called.
“Q. All right. Now the law come out to your house; is that right?
“A. They came.
*1212 “Q. Do you remember the officer that came out there?
“A. When they came out there, they asked me who it was.
“Q. Do you know what officer came out to your house?
“A. Ido.
“Q. What was his name?
“A. I don’t know his name, but Mr. Mo-ton back there and the other one back there.
“Q. So Officer Moton came to your house?
“A. Yes.
“Q. Did you describe the person that was in your house with this sawed-off shotgun that demanded money from you?
“A. I knowed the boy.
“Q. You knew who the person was?
“A. I knew the person, but it took me a good while to place just exactly who he was. I knowed his face, but I had to wait a little while before I could just say definitely who he were.
“Q. In other words, you knew the name of the person?
“A. I knew the name. After I placed him, then I knew his name..
“Q. How long did it take you to place this person?
“A. Didn’t take me so awfully long.
“Q. Were you able to place the person that night when the Sheriff first came? Were you able to place the person that night when the Sheriff first came to your house? .
“A. I told him it was Archie Peoples.
“Q. When did you tell him that?
“A. That night and then I told him, I said, ‘Let me study over this thing and let me make sure.’ I said, ‘You come back in the morning.’
“Q. About what time of night was this, do you know?
“A. Somewhere between ten and ten thirty. I think it was about ten fifteen when I first looked at the clock.
“Q. What time was it when the Sheriff came to your house?
“A. It was about 15 minutes later.
[[Image here]]
“Q. And did they come back Sunday morning?
“A. Came back early Sunday morning.
“Q. And who came back?
“A. Mr. Moton, and I told him, I said, ‘It was Archie Peoples.’
“Q. You are absolutely sure this was Archie Peoples?
“A. I made sure it was Archie Peoples.
[[Image here]]
“Q. How long have you been knowing him?
“A. When he was a little boy I hauled him to school.
“Q. About how old was he when you first hauled him to school?
“A. I wouldn’t know, but it was something like that then.
“Q. And you’ve been knowing him since that time?
“A. How’s that?
“Q. You’ve been knowing him since that time?
“A. I seed him occasionally.
“Q. You used to haul him to school?
“A. Yes.
“Q. Do you still work — are you still driving a school bus?
“A. That’s right.
“Q. And you are telling this Court that this man sitting right here is the man—
“A. (Interposing) That’s the man right there, Archie Peoples.”
Deputy Willie L. Moton testified on the call of the defendant. He had with him a copy of the report of the incident made by him. On direct examination, he testified:
“Q. And in this report did you say that,
‘A vague description of the suspect was given at the time’? Was that the first night?
“A. That’s the first night.
“Q. All right. And then you have entered on your report, ‘11-22-81,’ which was the next day; is that right?
“A. Yes.
*1213 “Q. At approximately 9:30 A.M. Now you again — did you go back to the Dan-dridge family at that time?
“A. Yes, sir, I did.
“Q. And you say the Dandridge family was contacted again by this writer and was given the names of Eddie Moore, black male, and Archie Peoples, as the ones who had robbed him.
“A. That’s right.
“Q. And also, did you add, ‘Lonnie James Abrahams, black male,’ also as suspects?
“A. (No response).
“Q. Along with a black female that was traveling with him?
“A. That’s right.
“Q. Did you give these names to Mr. Dandridge?
“A. No, I did not.
“Q. What does that mean right there?
“A. That means he gave me — he told me the names.
“Q. It says, ‘Was contacted by this writer.’ Now you contacted him and was given the names?
“A. Yes, sir.
“Q. You gave them those names?
“A. No.
“Q. You are saying he gave you these names?
“A. That’s right.
“Q. You got here that he was contacted by you. You are the writer of this report; is that right?
“A. Yes, sir.
“Q. And on the first night he gave you a vague description; is that correct?
“A. On the first night he told me, he said he knew the man, but he couldn’t call the name. He told me to come back the next morning and he would talk with me again about it.
“Q. Did you go back the next morning.
“A. I went back the next morning.
“Q. Did you ever show him any pictures and all for him to identify?
“A. I did at a later date after he was arrested because we didn’t have a picture.
“Q. How long after this time did you show him these pictures?
“A. It was on the 22nd of January, 1982.
“Q. Did you show him any pictures other than the pictures of Archie Peoples?
“A. Yes, sir.
“Q. How many others do you recall?
“A. Five other pictures.
“Q. Did both Mr. and Mr. [which we construe as Mrs.] Dandridge identify him?
“A. Mrs. Dandridge identified it second.
“Q. That was her second choice?
“A. Yes, sir.”
On cross-examination by the State, the witness testified:
“Q. Which choice was Mr. Dandridge’s?
“A. Mr. Dandridge identified him as his number one choice.
“Q. So Mr. Dandridge didn’t have any problem in choosing which one of these five photos?
“A. No.
“Q. And the one that Mr. Dandridge chose on his first attempt was that of Archie Peoples?
“A. That’s right.
[[Image here]]
“Q. Now isn’t it a fact that before you left Mr. Dandridge’s house that night, that he gave you the name?
“A. He did tell me.
“Q. What name did he give you?
“A. Archie Peoples.
“Q. That night?
“A. That night.
“Q. And isn’t it a fact that he told you or said to you, ‘Come back in the morning after I study on it a little bit?’
“A. That’s what he told me, to come back in the morning. He said, T don’t want to tell you nothing I don’t know for sure.’
“Q. So even though he gave you a name, he told you to come back so he could be definite; is that right?
“A. That’s right.
“Q. And you came back the next day?
“A. I did.
*1214 “Q. What time?
“A. Approximately 9:30.
“Q. Did you talk to Mr. Dandridge?
“A. I did.
“Q. What did he tell you?
“A. He told me that it was the man that had the gun and it was Archie Peoples.
“Q. He was sure of that?
[[Image here]]
On redirect examination, Officer Moton testified:
“Q. Did you ever make a statement to Mr. Peoples that the description didn’t fit him? That there was no way to identify him?
“A. No, sir.
“Q. That it was too vague a description?
“A. No, sir; I did not. Mr. Peoples and I had very few conversations.”
We are inclined to agree with the appellant that it was made known to the trial court that the expected testimony of the absent witness was not cumulative of the testimony witnesses as to an alibi, but that such testimony “was expected to discredit the identifications of the defendant.” However, we are unable to find any basis for a conclusion that it would or could have substantially discredited the identification of the defendant by either of the eyewitnesses to the incident. They were positive in their identification of him. Furthermore, they were subjected to extensive and intensive cross-examination that would have revealed any weakness in their testimony as to their identification of defendant. Moreover, the defendant had the benefit of the testimony of Deputy Moton, as to what the eyewitnesses of the robbery said less than an hour after the robbery and what they said the next morning, which should have removed any reasonable doubt as to the accuracy of their identification of the defendant. We are convinced that the trial court was well within the province of its judicial discretion in overruling defendant’s motion for a continuance or a suspension of the trial until further opportunity had been afforded defendant to produce, by judicial process or otherwise, the absent witness. There is agreement between the parties on appeal that generally such a motion is addressed to the sound discretion of the trial court, as shown by the cases cited by the parties. Smith v. State, Ala.Cr.App., 368 So.2d 298 (1978), cert. denied, 368 So.2d 305 and Goodrum v. State, Ala.Cr.App., 402 So.2d 1103 (1981), cited by appellant; Smith v. State, supra, Stewart v. State, Ala.Cr.App., 398 So.2d 369 (1981); Smith v. State, supra, and Pugh v. State, Ala.Cr.App., 376 So.2d 1135 (1979), cited by appellee.
The only other issue presented by appellant is thus stated in appellant’s brief:
“The trial court abused its discretion and inflicted excessive, cruel, and unusual punishment upon the defendant in its sentencing the defendant.”
The transcript shows that at the sentence hearing the court was informed that the defendant had had a conviction in Chicago in 1966 and that there had been other charges against him in court in Chicago, Ill., in Jefferson County, Alabama, and in Mar-engo County, Alabama, but the court made it known that there was not sufficient evidence brought to the attention of the court that would entitle the State to proceed against the defendant under the Habitual Felony Offenders Act. The remainder of the sentence hearing is as follows:
“Now I’ve explained to him, Mr. Bonner, that he does not have the right to proceed on those at this time by reason that they are premature. Now I’ve dismissed that for that reason, but still preserving his right to file it at the proper time.
“MR. BONNER: Yes, sir, Your Honor. First, the defendant would like to move for a mistrial and/or a new trial based on ineffective counsel in the prior proceeding.
“THE COURT: All right. The Court will deny that motion. Mr. [defendant’s appointed trial counsel] is competent counsel. He’s tried many cases and I’m familiar with his record over the years connected with both prosecution and defense in criminal cases.
“MR. BONNER: I would also move for mistrial based on the grounds that there *1215 is tampering with the Grand Jury, in the selection of the Grand Jury.
“MR. SULLIVAN: Are you talking about the Grand Jury or the jury?
“MR. BONNER: The jury.
“THE COURT: As far as the Grand Jury is concerned, having entered a general plea to the charge of not guilty, he’s waived any right to challenge the Grand Jury. That’s a pretrial motion.
“MR. BONNER: Yes, sir.
“THE COURT: That would be denied. Now likewise the composition of the Petit Jury that tried the case, that’s part of the record in this case and will be subject to review on appeal and that’s likewise denied.
“MR. BONNER: Yes, sir. Then, Your Honor, considering that it appears to me that there was some circumstantial evidence used and also that the Defendant was a contractor in Chicago, Illinois, that he’s married and has three children [naming one of the age of twelve, another of the age of ten and another of the age of five], that the Defendant would request that the Court be lenient in this situation.
“THE COURT: In reviewing this record, leniency is not indicated. Is there anything further?
“MR. BONNER: Do you have anything to say?
“MR. PEOPLES: I was contracting and I came down to brick my father’s house and that’s what I was doing since 1974. I’ve been self-employed as a contractor. I do all phases of residential buildings, and kinds of repairs or what have you.
“THE COURT: You’ve been doing some things since ’74 besides contracting. Between 1967 and ’81 you had five arrests in the State of Illinois. ’81 and ’82 you had four arrests in the State of Alabama. It seems like you spend a whole — you don’t spend a whole lot of time in the contracting business.
“Is there anything further from the State?
“MR. SULLIVAN: Judge, we would request a substantial sentence in this case. These were two elderly black individuals who Were tied up and robbed of in effect their life’s possession at that time which totaled $271. It was a very bad situation for those two individuals and because of that and his history, we would request a substantial sentence against Mr. Peoples. “THE COURT: All right. The Defendant having been found guilty of robbery in the first degree and sentence on said verdict deferred, he’s accordingly adjudged to be guilty and as punishment for this offense, he is sentenced to the penitentiary of Alabama for life.
“Now if you give notice of appeal, he can take it on up.
“MR. BONNER: Yes, sir.
“THE COURT: That will be duly entered.
“MR. BONNER: We would like to give notice of appeal, Your Honor.
“THE COURT: All right. The sentence being longer than 20 years, bond is not indicated.
“Now, Mr. Bonner, you are appointed to represent the Defendant on appeal.
“(Whereupon the proceedings concluded this date).”
Appellant’s contention that the cause should be remanded for another sentence hearing is not well taken, in our opinion.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur, except BOWEN, P.J., who concurs in the result only.